MARATHON OIL COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–428 T.

United States Court of Federal Claims.

July 17, 1998.

Hak K. Dickenson, Houston, Texas, with whom were Newman T. Halvorson, Jr., Washington, D.C., and Catherine L. Zabel, Houston, Texas, for plaintiff.

Department of Justice, Tax Division, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

Plaintiff Marathon Oil Company (Marathon), successor by merger to Husky Oil Company (Husky), seeks recovery of alleged overpayments of Windfall Profit Tax (WPT) paid by Husky in the amount of $5,477,350 for the years 1980 and 1981. Central to the case are two closing agreements executed by plaintiff and the IRS in October 1986 concerning Husky's WPT liability for 1980 and 1981. Prior to executing these agreements Marathon, relying upon a recent IRS Revenue Ruling, had filed two refund claims with the IRS for alleged overpayments of WPT in 1980 and 1981. The IRS subsequently denied the refund claims on the grounds that the executed closing agreements settled the issue of WPT liability for the years in question and hence foreclosed further consideration of the refund claims. Plaintiff contends that the refund claims are not within the scope of what the parties intended the closing agreements to address, and hence the refund claims were improperly denied by the IRS. In addition, plaintiff seeks recovery based on three other allegations: 1) that the IRS made improper WPT assessments after the expiration of the statute of limitations; 2) that the IRS failed to issue a required statutory notice of deficiency; and 3) that the IRS improperly transferred money into an excess collections account.

After consideration of the record developed at trial, the numerous briefs filed by both parties[1], and the court's own review of

---

1. During post-trial briefing, the court filed defendant's "reply" to plaintiff's reply post-trial brief. This brief was not contemplated under the post-trial briefing schedule ordered by the court.

the applicable law, the court is compelled to deny plaintiff's refund claim in its entirety.

## RULE 615 VIOLATION

■ Before addressing the merits of plaintiff's complaint, the court must resolve a potentially important motion regarding an alleged violation of Rule 615 of the Federal Rules of Evidence, commonly known as the "witness exclusion rule." The rule states:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

At the beginning of the trial, and at the request of plaintiff's counsel, the court invoked Rule 615. The trial record clearly indicates that defense counsel was aware the rule was being invoked. However, during the cross-examination of Mr. Ivan Beattie, a potentially important government witness, Mr. Beattie revealed that he had reviewed the transcript of testimony given earlier in the trial by one of plaintiff's principal witnesses, Mr. Duane Beamer.[2] Plaintiff then moved that Mr. Beattie's testimony be stricken for violation of the witness exclusion rule. The court allowed Mr. Beattie to continue testifying but requested briefing from the parties on plaintiff's motion and possible sanctions if the court's order were indeed violated.

It is clear to the court that Mr. Beattie's review of the transcript of Mr. Beamer's trial testimony violates the court's sequestration order. As this court has previously stated:

We recognize that the *plain language* of Rule 615 refers only to the "hearing of testimony." But as we previously explained, that phrase has had a long-standing and consistent judicial construction of prohibiting all prospective witnesses from hearing, overhearing, being advised of, reading, and discussing, the previously given in-court testimony of witnesses. . . .

*Weeks Dredging & Contracting, Inc. v. United States*, 11 Cl.Ct. 37, 53 (1986). Moreover, the court finds that defendant's strained and hyperliteral argument-that the rule only covers the "hearing" of testimony by a witness sitting in the courtroom absent a more specific order from the court-to be simply untenable. Indeed, such an interpretation would eviscerate the purpose of the rule, which "has long been recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion." *Notes of the Advisory Committee to Rule 615.* If anything, reading the transcripts is more violative of the spirit of the rule than having the witness listen to testimony in open court: reading the transcripts gives the witness an opportunity to carefully study, review, analyze and shape his testimony in a manner unavailable to the witness who may hear the testimony but once in open court.

Defendant's assertion that the court's sequestration order did not specifically cover the reading of transcripts makes little sense for this reason. Without an implicit restriction on the review of transcripts (that is, the verbatim record of the testimony given by

---

Plaintiff has 1) moved for reconsideration of the court's decision to file defendant's reply brief; 2) moved to strike defendant's reply brief; and 3) moved for sanctions against government counsel. Plaintiff has also moved, in the alternative, for filing of its own sur-reply brief in response to defendant's additional brief.

Although the court has at times shared plaintiff's frustration with the conduct of defendant's counsel, the court believes that defendant's additional brief, as well as plaintiff's additional brief, aid the court in answering the questions the court must address to resolve this dispute. Accordingly, the court denies the motion for reconsideration, the motion to strike, and the motion

for sanctions, and grants plaintiff's alternative motion to file a reply to defendant's reply brief. The court has considered both additional post-trial briefs in making its decision.

2. The exchange between plaintiff's counsel and Mr. Beattie went as follows:

Q. What about reviewing a transcript of Mr. Beamer's testimony? Did you take a look at that?

A. Yes. Review is a good expression for it. I did it about like I did my deposition. I went through and I finished it.

Tr. at 680.

the witnesses at trial) by future witnesses, invocation of the rule would serve no purpose. The court assumes the Rules of Evidence are not purposeless, and hence the court believes there is no need that the sequestration order specify the obvious: that prospective witnesses cannot read transcripts of prior witness trial testimony, which is the practical equivalent of listening to the testimony in the courtroom.

The more difficult question for the court is what sanction, if any, should be imposed for this violation of the order. Plaintiff has moved to strike the testimony of Mr. Beattie in its entirety or, in the alternative, to strike that portion of Mr. Beattie's testimony that relates to his conversations with Mr. Beamer. The government counters that striking the testimony is not an appropriate sanction, and requests in the alternative that should the testimony be stricken the transcript of Mr. Beattie's 1991 deposition be admitted into evidence.

 It is clear that it is within the court's discretion to impose sanctions, including exclusion of the testimony of the offending witness altogether, should the circumstances warrant. *Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893). In *Holder,* the Supreme Court held that the "right to exclude under particular circumstances may be supported as within the sound discretion of the trial court." *Id.* The court further recognizes that, although exclusion of testimony is a sanction within the court's discretion, it is an extremely harsh sanction which the court should not impose lightly.

 Although the court views the review of the transcript as a violation of the witness exclusion rule, the court will not grant plaintiff's motion to strike the testimony of Mr. Beattie. Ultimately, the severity of the sanction, including the striking of testimony, turns on two questions. First, what was the wilfulness of the violation, by both counsel and the witness? Second, what was the prej-

udice suffered by the opposing party as a result of the violation?

As to the first inquiry, the court believes that there was not a wilful violation by either counsel or the witness. The witness had no reason to know that he wasn't supposed to read the transcripts. He was, quite understandably, relying on counsel. The case of the counsel is more difficult. It is hard to believe that counsel, with any thought, could have understood the meaning of the rule to allow the reading of the transcript. However, people, particularly people under pressure, do make stupid mistakes. The court found no evidence that this was wilful or purposeful conduct. Based upon the attorney's general conduct during the trial the court found no evidence or pattern of sleazy behavior that might characterize a person who did this wilfully rather than stupidly.

Second, plaintiff has suffered little or no prejudice as a result of this violation. As discussed *infra,* Mr. Beattie's testimony is relevant only on the narrow question of whether there was a misrepresentation by the IRS which would permit the closing agreements to be reopened. Mr. Beattie's trial testimony differs in no material respect from his 1991 deposition testimony regarding his dealings with Mr. Beamer. Given this, the court believes it most appropriate to consider Mr. Beattie's testimony in light of the violation, with the recognition that he did have the ability to review Mr. Beamer's testimony in advance.[3]

Because the court does not view defendant's actions as a bad faith attempt to circumvent the court's order, and because the harm to plaintiff's case is minimal to nonexistent, the court declines to exercise its discretionary authority to invoke the sanction of striking Mr. Beattie's testimony, either in whole or in part. Instead, to the extent necessary, the court will consider Mr. Beattie's testimony in light of the knowledge that he did have the ability to review the transcripts, which will be factored into any rele-

**3.** Plaintiff repeatedly contends in its briefs that the testimony of Mr. Beattie was not credible. After hearing Mr. Beattie the court has some sympathy with these assertions. In light of this, it is difficult also to see why plaintiff is prejudiced if this supposedly incredible testimony can be reviewed and considered by the trier of fact.

vant credibility determination made by the court.

## BACKGROUND

Plaintiff Marathon Oil Company is an Ohio corporation having its principal place of business in Houston, Texas. In March 1984 Marathon purchased all of the issued and outstanding stock of Husky Oil Company, a Delaware corporation owned by Husky Oil Limited of Canada. In May 1984, Husky merged into Marathon pursuant to the laws of Delaware and Ohio. As a result of the merger, Marathon succeeded to all of the assets and liabilities of Husky, including Husky's rights to refunds of federal income and excise tax overpayments, and any liabilities for federal income and excise taxes not paid by Husky.

From March 1, 1980 through May 31, 1984, when it merged with Marathon, Husky produced oil in the United States and qualified as an integrated oil company pursuant to I.R.C. § 4995(b)(3). During that time Husky was liable for the payment of windfall profit tax.[4] The windfall profit tax was an excise tax imposed on the windfall profit from the sale of crude oil produced from domestic wells during March 1980 and each calendar quarter beginning after March 1980. 26 U.S.C. § 4986(a), 4996(b)(7). Throughout this period, Husky timely filed and reported its liability for WPT on a quarterly federal excise tax return, Form 720, and timely made the appropriate deposits with the Internal Revenue Service Center at Ogden, Utah. Husky's WPT tax returns for the taxable periods of 1980 and 1981 were ultimately audited by the IRS and, as a result of the audit, on September 21, 1983 the Service issued a "thirty-day letter" proposing deficiencies in the WPT for each of the quarterly taxable periods in 1980 and 1981.[5] The proposed deficiencies totaled $1,318,253.20 for 1980 and $5,713,180.66 for 1981.

After receiving the 30-day letter, Husky's accounting firm, Peat Marwick, Mitchell & Co. (Peat Marwick) timely appealed the 30-day letter. IRS Appeals Officer Michael Smith was assigned to Husky's appeal. After the appeal, Mr. Smith met with officials of Peat Marwick and Husky on three occasions in 1984 to discuss the issues in the appeal. Although these discussions were coordinated by Peat Marwick, Duane Beamer, manager of Marathon's excise and property tax group, attended the second of these meetings on September 6, 1984.[6]

By the end of 1985, the IRS and Peat Marwick had tentatively resolved nearly all the issues raised in the 30-day letter. On January 15, 1986, Appeals Officer Smith left the Service, and the case was reassigned to Appeals Officer Ivan Beattie. Shortly thereafter, Peat Marwick received a tentative proposal from the IRS that would result in an overpayment for 1980 of $627,018 and a deficiency of $2,405,915 for 1981 in its WPT payments. In April 1986, because the statute of limitations was due to expire on the WPT assessments, Mr. Beattie sent to Peat Marwick a Form 872 (Consent to Extend the Time to Assess Tax), which would extend the period for assessing WPT from June 30 to December 31, 1986. Husky representatives signed the forms on April 30 and the IRS signed on May 5, 1986.

On March 31, 1986, the IRS published Revenue Ruling 86–45, which held that the state portion of the Wyoming ad valorem tax qualified as a severance tax for purposes of calculating windfall profit tax. Husky, which had paid this tax on the production of its crude oil in Wyoming for 1980 and 1981, had not made a severance tax adjustment based on the payment of the Wyoming ad valorem tax in any of the taxable periods of 1980 and

---

4. The Crude Oil Windfall Profit Tax Act of 1980. Pub.L. No. 96–223. The tax was designed to recoup some of the "windfall profit" that it was feared domestic oil companies would reap after oil price controls began to be gradually lifted in 1979 and prices finally adjusted to the world market price. The tax was ultimately repealed as part of the *Omnibus Trade & Competitiveness Act of 1988.* Pub.L. No. 100–418 § 1941.

5. Because the tax took effect on March 1, 1980, the first quarter WPT tax for 1980 only reflects payment for the month of March.

6. Although Marathon had taken control of Husky on May 31, 1984, Marathon and Husky Canada had agreed that Husky's accounting firm, Peat Marwick, should try to resolve the issues regarding the 1980 and 1981 WPT.

1981. Marathon believed that making such an adjustment based on the Revenue Ruling would result in a substantial reduction in its WPT liability for Husky in 1980 and 1981.

In June 1986, Marathon took over handling the appeal from Peat Marwick. However, when Marathon initially suggested modifying the agreement to reflect the issues raised in Revenue Ruling 86–45, Appeals Officer Beattie refused to do so, and told Marathon that any modification would require that the entire case be sent to an examiner for re-evaluation. Both Mr. Beamer and Ronald Hecht of Peat Marwick testified that Mr. Beattie suggested another course of action. Both testified that Mr. Beattie proposed that they first file the refund claims based on Revenue Ruling 86–45 at an examination center other than his own, and that the closing agreement then be signed. Both testified that Mr. Beattie said that this action—filing the refund claims before signing the closing agreements—would protect their refund claims and ensure that they were to be considered separately from the closing agreements.

On October 24, 1986, Marathon filed eight refund claims for WPT refunds with the IRS for each taxable period in 1980 and 1981. The case was filed in Ogden, Utah, where Husky's original claims had been filed. Six days later, Ken Matheny, General Tax Manager for Marathon, signed two IRS Forms 866, sent by Mr. Beattie, each entitled "Agreement as to Final Determination of Tax Liability", and each governing one of the two taxable years 1980 and 1981. The forms arrived at total tax liability of $15,786,217 for 1980 and $39,894,641 for 1981. On November 6, 1986, the Chief of the Appeals Office in Denver, Colorado signed and executed the Forms 866 on behalf of the government. In November 1987, plaintiff was ultimately informed, after an inquiry was made to the IRS, that the refund claims had been denied because the executed Forms 866 settled Husky's WPT tax liability for 1980 and 1981 and foreclosed any other claims.

After signing the Forms 866, the Forms and the IRS administrative file for Husky's WPT liability for 1980 and 1981 were forwarded to the IRS Austin Compliance Center (ACC) and the matter was assigned to Mark Ransick, who was Technical Coordinator for the ACC's WPT staff. As technical coordinator, Mr. Ransick would review the administrative file to work up a schedule so that he could instruct the clerical staff on how to make the assessments. The supporting schedule accompanying the Forms 866 showed the overpayment for 1980 and deficiency for 1981 broken down pro rata per calendar period. Based on this, Mr. Ransick prepared a workpaper prorating the 1980 overpayment of $627,742 and the 1981 deficiency of $2,405,915 by taxable period.

On December 30, 1986, with the revised statute of limitations expiring the next day, the IRS issued prorated assessments for each of the four quarterly tax periods. The total deficiency was simply divided into four quarterly deficiencies of $601,479, and interest was assessed per quarter. However, the assessments did not take into account the overpayment for the tax periods in 1980. In March 1987, Marathon received notices from the IRS of the 1980 overassessments. These notices, however, did not indicate how the overpayments would be applied against the 1981 deficiency.

Marathon was concerned that the flat prorated adjustment, and the failure to credit the 1980 overpayment towards the 1981 deficiency, did not accurately reflect Husky's real liability per quarterly taxable period (which would also affect interest owed per quarter). Shortly after receiving the 1981 assessments Glenn Leach, Marathon's supervisor of WPT, contacted Mark Ransick at the Austin Compliance Center to express Marathon's concerns with the defects in the allocation of the assessment. Mr. Leach ultimately provided the IRS with several revised schedules for the taxable periods in 1980 and 1981 that recalculated the amount due per quarter, which consequently affected the interest payments. On March 30, 1988, after more than a year of discussions with the IRS, Marathon made a payment of $3,805,-409.73 to satisfy the 1980 and 1981 combined deficiency and interest payments. The payment reflected the same total overpayment for 1980 ($627,742) and the same total deficiency for 1981 ($2,405,915) that the parties

originally agreed to in October 1986. The total interest payment ($2,027,237.73), however, reflected the reallocation of the overpayment and deficiency for each quarter and the consequent effect on the total interest due.

Plaintiff filed the instant complaint seeking a refund of $5,477,350 in overpayments of WPT and assessed interest for the quarterly taxable periods in 1980 and 1981. Marathon contends that the Form 866 closing agreements did not foreclose the consideration of the refund claims pursuant to Revenue Ruling 8645 because the refund claims were outside the scope of the closing agreements. Further, plaintiff seeks additional refunds based on additional allegations: the IRS failed to issue a statutorily required notice of deficiency; there were improper assessments after the expiration of the statute of limitations; and the IRS improperly transferred funds to an IRS excess collection account.

## ANALYSIS

### I. WPT Refund Claims

Central to this dispute is the proper scope of the closing agreements signed and executed by the IRS and Marathon in November 1986. The government contends, as it did at the time that the WPT refund claims were denied, that the execution of the closing agreements for 1980 and 1981 foreclosed consideration of any claims relating to those tax years and the windfall profit tax liability of Marathon, regardless of when those claims were filed. Plaintiff contends that the parties intended for plaintiff to be able to pursue the refund claims separately from the closing agreements.

#### A. Scope of closing agreements

Closing agreements are authorized under I.R.C. § 7121, which allows the Commissioner to enter into agreements in writing with taxpayers to determine their total tax liability for "any internal revenue tax for any taxable period." 26 U.S.C. § 7121 (1988); 26 C.F.R. § 301.7121–1 (1993). The provision further states that, if the agreement is approved by the Commissioner:

> such agreement shall be final and conclusive, and, except upon a showing of fraud

or malfeasance, or misrepresentation of a material fact—

> (1) the case shall not be opened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States. . . .

26 U.S.C. § 7121(b).

In November 1986, the parties executed two such agreements pursuant to section 7121. The agreements were executed on IRS Forms 866, designated as such in the top left-hand corner of the page. Each Form 866 is entitled "Agreement as to Final Determination of Tax Liability." Each form 866 in only one page in length, and states that the parties "agree that the liability of the above taxpayer for the kind of tax and taxable period is as follows:" The Forms then contain four columns, specifying 1) the "period" the closing agreements cover; 2) the "kind of tax or penalty" that is the subject of the closing agreement; 3) the "chapter subchapter letter of the internal revenue code," which signifies the part of the Code under which the tax is due; and 4) the "Total Amount Due for the Period," which specified the taxpayer's total tax liability for the tax period specified in Column 1 and for the specified tax in Column 2. The agreements specified the type of tax (Windfall Profits), the taxable period (8012, or calendar year 1980, and 8112, or calendar year 1981), and the total amount due for each period ($15,-786,217 for 1980 and $39,894,641 for 1981).

Each agreement, in language mirroring the statutory language found in section 7121, also stated, following the specification of the type, amount, and period of the tax, the following:

> This agreement is final and conclusive except:
>
> (1) the liability it relates to may be reopened in the event of fraud, malfeasance, or misrepresentation of a material fact;

The parties do not dispute the binding nature of the closing agreements. Rather, Marathon contends that the closing agreements did not include the eight refund claims based on Revenue Ruling 86–45, which were filed just six days before Marathon signed the closing agreements. Plaintiff argues that

the closing agreements were, at best, only partially integrated agreements and that the parties intended to reserve or treat separately the pending refund claims. Alternatively, plaintiff argues that, should the court find that the closing agreements are fully integrated, they contain ambiguous terms which properly interpreted support plaintiff's interpretation of the contract. Lastly, plaintiff argues that, even if the court finds that the closing agreements are fully integrated, unambiguous contracts, the agreements are void because of misrepresentation of a material fact or malfeasance, which would permit the agreements to be reopened pursuant to the language of the closing agreements and section 7121.

Defendant counters that, since closing agreements are creatures of statute, the court has no jurisdiction to consider the refund claims because the statute divests the court of jurisdiction to annul, modify, set aside or disregard the closing agreements absent a showing of fraud, malfeasance or misrepresentation of a material fact. Although defendant concedes that "contract principles" may be used in some instances in construing closing agreements, defendant argues they are governed by statute, and rules generally applicable to contracts do not apply to closing agreements.

■ As a preliminary matter, the court needs to determine what is the status of these closing agreements. Much space in the post-trial briefing has been devoted to whether closing agreements are contracts or not. The government's repeated effort to tell the court that the closing agreements are governed by statute, not contract law (although contract principles may apply) confuses the real issue. Indeed, the government's argument is a distinction without a difference. Closing agreements are authorized, and limited by, the language of the statute. To the extent that the statute conflicts with general and otherwise governing contract law principles, the statute governs. But closing agreements are contracts none-

theless,[7] and courts have repeatedly stated that, in analyzing closing agreements, the court must use ordinary contract principles. *United States v. Lane*, 303 F.2d 1, 4 (5th Cir.1962), *appeal after remand* 328 F.2d 602 (5th Cir.1964); *Rink v. Commissioner*, 100 T.C. 319, 1993 WL 101372 (1993); *In re Spendthrift Farm*, 931 F.2d 405, 407 (6th Cir.1991). Viewed through the conceptual framework of contract law, then, the government's argument is straightforward: the closing agreements are clear and unambiguous and, given the statute and its purpose, it cannot be questioned that the closing agreements settled Marathon's windfall tax liability conclusively for those years, rendering the pending refund claims moot.

■ Plaintiff argues that the closing agreements are, at best, partially integrated agreements which reserve or set aside the refund claims. Traditionally, if a document is determined to be a partial integration, prior or contemporaneous oral or written agreements may be incorporated provided they do not contradict a term of the partially integrated agreement. *See, e.g., Design and Production, Inc. v. United States*, 18 Cl.Ct. 168, 195 (1989). Plaintiff argues that the extrinsic evidence shows that the agreement was only partially integrated, and that the parties intended to reserve the refund claims while confining the settlement to those issues which had been originally raised in the 30-day letter.

The problem with plaintiffs analysis is that it ignores the statutory requirements the court must follow. Although its recitation of the common law of contracts regarding integration is correct, the court must also adhere to the statute authorizing closing agreements. Section 7121(a) states that "[t]he Secretary is authorized to enter into an agreement *in writing* with any person relating the liability of such person ... in respect of any internal revenue tax for any taxable period (emphasis added)." Thus, while the court may use traditional contract principles

---

7. As Judge Posner has stated regarding section 7121 closing agreements: "They certainly are contracts in the legal sense of the term, because they contain binding promises. The government does not claim to be free to walk away from a closing agreement, and it certainly does not acknowledge the right of a taxpayer to do so." *United States v. National Steel Corporation*, 75 F.3d 1146, 1150 (7th Cir.1996)

to interpret the closing agreements, it cannot vitiate the clear prescriptions of the statute, which, among other things, requires the closing agreement to be in writing. Plaintiffs interpretation of the agreement would thus contain a portion which was not in writing and hence not permitted for inclusion as part of the agreement under the statute.

Plaintiff points out that the statute explicitly states that closing agreements are limited in scope, because they cannot be "reopened as to the matters agreed upon." I.R.C. § 7121(b)(1). Plaintiff therefore believes that the court needs to determine the matters that were agreed upon in the closing agreements, which plaintiff believes the extrinsic evidence shows are the issues raised in the 30-day letter and not the refund claims. The problem is that the terms of the closing agreements state quite clearly what the matters agreed upon are. Indeed, the closing agreements track the statute quite precisely. They set forth a taxpayer's (Marathon's) "liability" ($15,786,217 and $39,894,-641) with respect to "any internal revenue tax" (windfall profit) for "any taxable period" (calendar years 1980 and 1981, respectively). They do no more or no less. There is no reservation of rights in the closing agreements. There is no term preserving the refund claims.

Indeed, given the writing requirement of the statute, it appears to the court that closing agreements would have to be fully integrated agreements, because the parties cannot add, subtract, or modify terms outside the agreements themselves. Of course, the court may invoke traditional contract principles to interpret the terms of the closing agreements, for instance in resolving ambiguous or conflicting terms in a closing agreement; the court cannot, however, fundamentally alter the agreement as written, which is what plaintiff's interpretation would have the court do.

Even if the court were not compelled to interpret the agreement as foreclosing the refund claims, the court would not be able to find a partial integration because the term which plaintiff wishes incorporated into the agreement would fundamentally contradict the essence of the closing agreements. As

stated previously, it is hornbook law that, if a document is determined to be a partial integration, then prior or contemporaneous oral or written agreements can be incorporated provided they do not contradict a term of the existing writing.

In this case, the purpose of the closing agreements is to establish, once and for all, plaintiff's liability for windfall profit tax. This is consonant with the language and purpose of I.R.C. § 7121, which provides a mechanism for the government and taxpayers to settle liability conclusively. As the Tax Court has stated:

> The purpose of the statute authorizing closing agreements is to enable the taxpayer and the government finally and completely to settle all controversies in respect of the tax liability for any previous taxable period, and to protect the taxpayer against the reopening of a matter at a later date, and to prevent the filing of additional claims for refund or the institution of suit for the same purpose by the taxpayer.

*Estate of Mitchell v. C.I.R.,* 65 T.C.M. (CCH) 2157, 2159, 1993 WL 85754 (1993) (quoting *Wolverine Petroleum Corp. v. Commissioner,* 75 F.2d 593, 595 (8th Cir.1935)). Indeed, the critical term of these closing agreements is the figure in the column "Total Amount Due." Reservation of the refund claims—which, if successful, would reduce WPT liability for calendar years 1980 and 1981—would effectively change the critical term in the closing agreements. It would destroy the very substance of the closing agreements.

Plaintiff argues that, even if the court finds that the agreements are complete integrations, they contain ambiguous terms, and the court must go beyond the "four corners" (or eight corners, since there are two closing agreements) to interpret the agreements. It is hornbook law that, although the parol evidence rule bars evidence of even prior or contemporaneous non-contradictory terms if an agreement is completely integrated, the court may rely on parol evidence to explain or clarify an ambiguity, but not to contradict the final expression. *See* Restatement (Second) of Contracts § 214 (1979). Plaintiff cites two ambiguities in each of the closing agreements that need clarification, and which

would permit the refund claims to be maintained.

First, plaintiff argues that the terms "liability" and "total amount due" contained in the closing agreements are ambiguous and must be interpreted in the context of the statutory words "as to the matters agreed upon." A review of the facts and circumstances, plaintiff argues, would show that "the matters agreed upon" were those that resolved the issues raised in the 30-day letter, with the intent that the refund claims be preserved. The problem is that the terms "liability" and "total amount due" are unambiguous, and lend themselves to no other interpretations within the context of the closing agreements.

Second, plaintiff argues that the closing agreements are ambiguous because it is impossible to tell from the closing agreements what the correct quarterly tax liability is. I.R.C. § 7121 grants the Secretary the authority to enter into a closing agreement for "any taxable period." Because, as plaintiff points out, the Internal Revenue Code defines the "taxable period" for windfall profit tax on a quarterly basis, *see* I.R.C. § 4996(b)(7), and the IRS manual requires the appeals officer to craft the closing agreement on the basis of the liability for each taxable period, plaintiff argues that the delineated calendar year period on each closing agreement is ambiguous. The court is hard pressed to see the ambiguity. The statute vests the Secretary with the authority to settle liability for "any taxable period," and this is exactly what the two closing agreements do. They settle conclusively the windfall profit tax liability for calendar years 1980 and 1981. Plaintiff's reliance on *Shell Oil Co. v. Commissioner*, 90 T.C. 747, 1988 WL 34874 (1988) in support of its proposition is inapposite. In *Shell*, the Tax Court found that the proper taxable period for determination of a deficiency in windfall profit tax is a calendar quarter. *Id.* at 753, n. 17. This has nothing to do with whether the Secretary can settle windfall profits tax liability for a calendar year, rather than a calendar quarter. The court finds nothing in the language of the statute or case law that suggests that the Internal Revenue Service is precluded from entering into a closing agreement regarding windfall profits tax for a calendar year rather than a calendar quarter. *See Wolverine Petroleum v. C.I.R.*, 75 F.2d 593, 595 (8th Cir. 1935). Regardless, it doesn't render an unambiguous term of the closing agreements ambiguous.[8]

## B. Fraud, Malfeasance or Misrepresentation of a Material Fact

I.R.C. § 7121 permits an otherwise valid closing agreement to be reopened upon a showing of "fraud or malfeasance, or misrepresentation of a material fact." Plaintiff contends that there was a misrepresentation by defendant that would permit the court to reopen the closing agreement. Plaintiff argues that, even if the closing agreements at issue were otherwise valid, plaintiff was "deliberately induced" to sign these closing agreements, and that the testimony from Marathon's employees shows that Marathon would never have signed the closing agreements had they believed that the WPT refund claims would be foreclosed by doing so.

In order to show misrepresentation, plaintiff must provide: 1) evidence of a statement or representation that is false or incorrect; 2) evidence that defendant knew the statement was false or incorrect; and 3) plaintiff's justified reliance on the false or incorrect statement. *Estate of Mitchell*, 65 T.C.M. (CCH) at 2158. The court finds that, even with the heightened scrutiny the court gives the testimony of Mr. Beattie, the evidence is at best inconclusive that there was a misrepresentation.

### 1. Evidence of a Statement or Representation that is False or Incorrect.

Plaintiff alleges that the evidence shows that Appeals Officer Beattie told a represen-

---

8. Even were the court to find the terms in the closing agreements setting forth the taxable periods to be ambiguous, this would not open up the entire agreement for reinterpretation. Rather, the court could review extrinsic evidence in an effort to ascertain the parties' meaning as to that term. It is inconceivable that even were there an ambiguity in the tax periods the court could then read into the agreement a clause reserving the refund claims.

tative for defendant, Mr. Duane Beamer, that Marathon could preserve its refund claims so long as it filed the refund claims with an office other than Mr. Beattie's. Given the government's position that the refund claims were foreclosed by signing the closing agreements, plaintiff contends that this evidence shows that the government's agent Mr. Beattie made a statement that was false.

The court is not persuaded. The court is presented with several pieces of information. Mr. Beamer did testify that, during his conversations with Mr. Beattie, Mr. Beattie told Mr. Beamer that he should file the refund claims with another IRS office and that he affirmatively indicated to Mr. Beamer that the refund claims would be preserved if filed prior to the execution of the closing agreements. Mr. Hecht also testified that Mr. Beattie had made such representations to him. Mr. Beattie testified differently, and indicated that, although he knew of Marathon's interest in filing the refund claims, he repeatedly told them that, should the refund claims be filed, he would have to send the case back for field examination. (Messrs. Beamer and Hecht also testified that this was Mr. Beattie's refrain until he informed them that they should file their refund claims somewhere else.)

The court is thus presented with a classic "he said/he said" proposition, with Messrs. Beamer and Hecht indicating that Mr. Beattie had informed them that they could pursue the refund claims elsewhere and Mr. Beattie denying that he made any such representation. In addition, there are two documents which could shed some light on the subject. Plaintiff points to a notation in Mr. Beattie's calendar on October 21, 1998, just nine days before the closing agreements were signed by Marathon: "Tele Call from: Beamer–Husky–will agree-Want to file claims for WST." WST presumably referred to, as Mr. Beattie testified, windfall profit tax. The note, and Mr. Beattie's attempted illumination of its meaning, tell the court little about what this means. Another relevant document is a letter sent by Mr. Beamer to Husky Canada on October 18, 1986 concerning the refund claims in conjunction with the settlement. The letter states: "Mr. Beattie's

response was that if we wished to introduce the refund into his case, he would simply ship the entire 1980–81 case back to Audit for reexamination."

From this the court can glean the following: Mr. Beamer, Mr. Hecht and Mr. Beattie have different recollections of their conversations, and specifically of what Mr. Beattie told Mr. Beamer to do. There is an ambiguous scribbled note on Mr. Beattie's calendar just days before the execution of the closing agreements; there is also a letter, dated October 18, 1986, from Mr. Beamer stating that Mr. Beattie would ship the whole case back for reexamination if they pursued the refund claims. From this stew of evidence the court can only conclude that it falls far short of providing a showing that the government's agent made a statement that was false or incorrect. The testimonial evidence is contradictory, and the documentary evidence is ambiguous.

### 2. *Evidence that the defendant knew the information was false or incorrect.*

Plaintiff argument flows from the same set of facts supposedly showing that Mr. Beattie provided false information. Because Mr. Beattie testified at trial that he knows that the closing agreements would foreclose the refund claims, the argument goes, Mr. Beattie knew that the information Mr. Beamer testified he was told by Mr. Beattie was incorrect. The problem is that it presumes that there has been a showing that defendant made a false or incorrect statement to plaintiff regarding the ability to preserve the refund claims. That showing was not made.

### 3. *Evidence that plaintiff justifiably relied on the false or incorrect statement.*

As with the second prong, this prong presupposes a showing that a false or incorrect statement was made, which the court has found is not the case. Even if the court had found an incorrect statement had been made by Mr. Beattie, the court doubts plaintiff would have been justified in relying on it. While it is true, as plaintiff has pointed out, that the forms were provided by the government, they are remarkably straightforward, simple, and easy for even a tax layperson to understand. Each closing agreement is just one page long, and clearly indicates the stat-

utory authority undergirding the agreement. Moreover, a taxpayer has a duty to "ensure that the closing agreements accurately reflect the settlement between the parties." *Estate of Mitchell*, 65 T.C.M. (CCH) at 2158. The court finds it stretches credulity that, notwithstanding the fact that all persons involved in Marathon's decision to sign the Forms 866 were professionals experienced in tax and accounting, they were justifiably relying on an oral representation. This is particularly true when a minimum amount of inquiry would make it plain to them that some action, other than signing the closing agreements, would be necessary to have the refund claims preserved.

The court thus finds that the closing agreements are fully integrated and contain no ambiguous terms. The court further finds that the evidence is insufficient to support a finding that defendant engaged in a misrepresentation which would permit the court to reopen the closing agreements. Accordingly, the court does not have the authority to reopen the closing agreements to consider plaintiff's refund claims, which the court finds are precluded by the executed Form 866 closing agreements.

## II. ASSESSMENT ISSUE

■ Plaintiff's remaining claims emanate from the series of events occurring after execution of the closing agreements. Plaintiff alleges that the IRS improperly assessed tax after the expiration of the limitations period, and that it is entitled to a refund for assessments made because defendant failed to issue a statutory notice of deficiency pursuant to I.R.C. § 6212(a).

The facts central to this portion of the dispute have been recounted earlier. After execution of the closing agreements on November 6, 1986, Mark Ransick, Technical Coordinator for the ACC's WPT staff, prepared a workpaper prorating the 1980 overpayment of $627,742 and the 1981 deficiency of $2,405,915, based on the total WPT tax liability agreed to in the closing agreements. On December 30, 1986, the day before the revised statute of limitation on assessments was to expire, the IRS issued assessments for the four quarters of 1981, simply by dividing the total agreed-upon liability by four, resulting in four quarterly deficiencies of $601,479, totaling $2,405,916, with interest calculated per quarter. There was no mention, and no accounting for, the overpayment for the 1980 quarters.

After the limitations period expired, plaintiff objected to the pro-rated assessment, and asked that the interest be abated and redetermined using more accurate schedules. After almost a year of discussion, the IRS and Marathon agreed to a revised computation based on a reallocation of the deficiency among the calendar quarters of 1981. On March 31, 1998, Marathon made a payment of $3,805,409.73 in satisfaction of the WPT deficiency and interest for 1981.

Plaintiff makes two arguments. First, plaintiff argues that the IRS made assessments of tax after the December 31, 1986 period of limitations. Plaintiff argues that the recomputations done by the IRS after December 31, 1986 included new tax assessments, which would make them overpayments and hence recoverable (with interest) pursuant to I.R.C. § 6401. Second, plaintiff argues that the IRS failed to issue a statutory notice of deficiency which it claims is required by I.R.C. § 6212(a), and hence plaintiff is entitled to collect because the failure to issue the statutory notices of deficiency render those assessments invalid.

### A. Invalid Assessments

Plaintiff argues that the recomputations done after the December 31, 1986 deadline included additional assessments made after the period of limitations expired. Defendant argues that the recomputations were relevant only to the extent they affected the interest owed. Because the amount of overpayment for 1980 and deficiency for 1981 remained the same, defendant argues that the reallocation to different quarters was an interest adjustment. Because I.R.C. § 6502(a) permits assessed taxes to be collected within six years after the assessment of the tax, and interest may be assessed and collected at any time within which underlying tax may be collected, defendant contends that the interest revisions were well within the period of limitations.

The critical question for the court is the following: were the revisions made after the December 30, 1986 assessment merely interest rate recalculations, in which case they were permissible and collectible, or did they constitute new assessments, beyond the period of limitations, rendering them invalid and entitling plaintiff to a refund as to those new assessments. The court finds the former to be the case.

There is no dispute that, after the period of limitation had expired, the parties engaged in substantial negotiations to reallocate the deficiency (and credit the overpayment), and to make several adjustments (including withholding adjustments and net income limitation adjustments). While the parties reallocated the WPT deficiency for the quarters of 1981, it is clear to the court that the only true import of this action was to change the interest ultimately due on the outstanding deficiency, which the parties had agreed upon when the closing agreements were executed (although the WPT refund claims did remain disputed). The payment ultimately made by plaintiff in March 1988 reflected the same agreed-upon overpayment and deficiency ($627,742 overpayment for 1980 and $2,405,915 deficiency for 1981) that resulted from the execution of the closing agreements.

Intuitively this makes sense, because, once the deficiency amount had been settled, the allocation per quarter is only ultimately important to the taxpayer because it affects the interest that the taxpayer may owe. This logic is also supported by the contemporaneous documentation. This documentation shows that the parties both believed, during the year-long process from when plaintiff first contacted the IRS about the allocation, until payment was finally made, that the process was one of recalculating interest. In its initial letter to the IRS addressing its concerns on April 21, 1987, Marathon stated: "[W]e request that the interest previously calculated by the Service for Husky's 1980 overassessment and 1981 deficiency be abated and redetermined per the method reflected on the attached schedules." In its March 31, 1988 letter accompanying their payment of $3,805,409.73 to the IRS in satisfaction of the liability for the taxable quarters of 1981, *Marathon* breaks down the payment as follows:

| | |
|---|---|
| 1980 Overassessment | $( 627,743.00) |
| 1981[WPT] Deficiency | 2,405,915.00 |
| Statutory Interest [net] | 2,027,237.73 |
| | |
| Total | $3,805,409.73 |

It is clear, then, that from the time of the original letter from Marathon in April 1987, until payment was made in March 1988, Marathon believed that the recalculations reflected interest adjustments and not new assessments. Additional correspondence on both ends, as well as internal memoranda of the IRS, support this conclusion. The ultimate payment by Marathon did not alter the agreed-upon determination of overassessment and liability for 1980 and 1981 as determined by execution of the closing agreements.[9]

## B. Failure to Issue Statutory Notice of Deficiency

There is no dispute that the IRS did not send a notice of deficiency to Marathon. I.R.C. § 6212(a) grants the Secretary the authority to send notices of deficiency to taxpayers and I.R.C. § 6213(a) grants the taxpayer 90 days from the date of the notice to file a petition with the Tax Court for a redetermination of the deficiency. The section further prohibits the government from making any assessment, and from instituting any proceeding to attempt to collect the deficiency, until after the 90-day period has expired or until a decision of the Tax Court relating to that deficiency is final.

9. At trial and in the post-trial briefs, much was made of whether the pro-rata allocation per quarter that Mr. Ransick made in his assessment was a permissible method. The testimony from Mr. Ransick showed that, while it is not the "preferred" method, it is nonetheless permissible if it would be otherwise difficult or impossible for the IRS to make the determination. The parties disputed vigorously whether the problem was the adequacy of Husky's records or the competence of the Austin Compliance Center. The court need not resolve this issue because it is clear that the method was permissible, although not preferred, and the parties ultimately arrived at a compromise, reflected in plaintiffs payment on March 31, 1988, which resolved interest issues to their mutual satisfaction.

Defendant argues that Revenue Procedure 68–16, which sets forth the procedures of the IRS regarding closing agreements, specifies that there is no need to obtain a waiver from the taxpayer of the need to file a notice of deficiency when a closing agreement has been executed. Plaintiff counters that Rev. Proc. 68–16 does not so indicate, but if it does, then it is violative of the statutory waiver requirement and hence void.

Revenue Procedure 68–16 states in pertinent part:

Form 870 and other waivers of restrictions on assessment and collection which are ordinarily signed and submitted by taxpayers pursuant to the provisions of section 6213(d) of the Code will ordinarily be submitted with respect to a taxable period the tax liability for which is being determined by closing agreement (assuming there is a deficiency or overassessment), though a waiver is not legally required in order to assess a deficiency without issuance of a statutory notice of deficiency in such cases.

Rev. Proc. 68–16, 1968–1 C.B. 770, 789. Section 6213(d), referred to in the Revenue Procedure, is the statutory provision which permits the taxpayer to waive the deficiency restrictions, including the notice of deficiency, if done so in writing to the Secretary.

 Although the language quoted above from Revenue Procedure 68–16 is inelegant, the IRS clearly believes that it need not issue a statutory notice of deficiency in cases where a closing agreement has been executed. Such interpretation makes sense when one considers the purpose of the notice requirement. Both the language of the statute and the case law instruct that its purpose is to provide the taxpayer with an opportunity to challenge the alleged deficiency in the Tax Court without first paying the amount due—while at the same time prohibiting the IRS from taking measures to collect the deficiency until the Tax Court decision (if that avenue has been pursued) is final. *See General Outdoor Advertising Co. v. United States,* 145 Ct.Cl. 127, 169 F.Supp. 947 (1959). In the instant case, by executing the closing agreements Marathon has in essence acknowledged that the deficiency is legitimate—indeed, it is the very purpose for entering into the closing agreements in the first place. Thus the notice would merely provide plaintiff with an avenue to challenge a deficiency which by signing the closing agreements Marathon has agreed is proper.

*General Outdoor Advertising Co. v. United States* provides some useful guidance in understanding the purpose of the notice of deficiency requirement. In that case, no closing agreement had been executed, but the taxpayer had paid a portion of tax that it did not contest in advance of the issuance of a notice of deficiency or the making of an assessment based on the revenue agent's recommended deficiencies. The court held that, as to the uncontested amount plaintiff had paid, the taxpayer had waived notice. As the court stated:

[I]f the taxpayer states that he does not care to contest it, of course the notice need not be sent, since it is sent only to permit a contest in the Tax Court, and the assessment may be made forthwith.

*Id.* at 131–32, 169 F.Supp. 947. Although the case does not involve a closing agreement and involves a case where plaintiff had already paid the tax, the case is not inapposite, as plaintiff suggests. The case suggests that, where the taxpayer has already agreed to the deficiency, the notice requirement is unnecessary because it really confers no procedural protections on the taxpayer, which is the purpose of the statute. Plaintiff in this case, just like plaintiff in *General Outdoor Advertising,* had already conceded the deficiencies, so a notice permitting plaintiff to challenge agreed-upon deficiencies is unnecessary, if not a waste of good paper.

Even were the court to find that the failure to issue a statutory notice of deficiency was in violation of the statute, which the court finds is not the case, the court would consider the claimed remedy of vitiating the terms of the closing agreements out of all proportion. Plaintiff agreed that it owed the deficiency for calendar year 1981 by signing the closing agreements, and the failure to provide notice merely closed the possibility that plaintiff could challenge the deficiency it

already agreed was due.[10] The court can find no authority for the proposition that the remedy for such a violation would be the refund of those agreed-upon assessments.

## CONCLUSION

For the reasons enunciated above, plaintiff's claims are denied in their entirety. The court finds that the duly executed closing agreements are fully integrated agreements that contain no ambiguous terms. There has been no showing of fraud, malfeasance, or misrepresentation that warrants reopening the agreements. Accordingly, the refund claims are foreclosed and the court is without jurisdiction to entertain them. In addition, the court finds that there were no assessments made after the period of limitations and that the failure to issue a statutory notice of deficiency was not improper or illegal. Plaintiff is therefore not entitled to a refund based on these claims.

**IT IS SO ORDERED.**

10. The court acknowledges that the discussion in the preceding paragraphs is premised on the idea that the recomputations done in 1987 and 1988, after the assessment on December 31, 1986, did not result in new and improper assessments after the period of limitations, but instead were interest recalculations. The result might be different if they were not.