NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent. It is a public record.

# United States Court of Appeals for the Federal Circuit

04-5028

BLUE CROSS & BLUE SHIELD UNITED OF
WISCONSIN & SUBSIDIARIES,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED: November 19, 2004

_____

Before NEWMAN, LINN, and PROST, Circuit Judges.

PROST, Circuit Judge.

Blue Cross & Blue Shield United of Wisconsin & Subsidiaries (BCW) appeals from a decision of the United States Court of Federal Claims, Case No. 98-CV-727, in which the court granted summary judgment to the United States regarding the meaning of a provision in a Closing Agreement that settled a prior tax dispute between BCW and the United States. In particular, BCW appeals the court's decision that the Closing Agreement did not allow BCW to use its actual 1987 data, rather than the estimate it computed at the beginning of 1987, to calculate its "unpaid loss reserve" for 1987. We reverse the court's grant of summary judgment and remand for consideration of extrinsic evidence.[1]

---

[1] On remand, the Court of Federal Claims may, of course, continue to consider intrinsic evidence in conjunction with the extrinsic evidence.

BACKGROUND

In 1993, BCW and the Internal Revenue Service (IRS) settled a tax dispute by entering into the Closing Agreement that is now before this court. The details of the dispute resolved by the Closing Agreement are discussed in the Court of Federal Claims' opinion. See <u>Blue Cross & Blue Shield United of Wisc. & Subsidiaries v. United States</u>, 56 Fed. Cl. 697, 698-99 (2003).

The Closing Agreement contains the following paragraph, with the language most relevant to this appeal underlined:

> (3)   As of January 1, 1987, the taxpayer was an "Existing Blue Cross or Blue Shield organization" as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC. <u>As such, the following attributes apply to the taxpayer as of that date</u>:
> (a)   if otherwise in compliance with the terms of THE TREG, the taxpayer may participate in the filing of the "new group election" cited in subparagraph (d)(5)(v) of THE TREG;
> (b)   the taxpayer's taxable income will be computed pursuant to the provisions of section 833, Subtitle A, IRC, and the "special rules for Existing Blue Cross or Blue Shield organizations" stated in section 1012(C)(3) of the TRA;
> (c)   the taxpayer's taxable income will be computed without the reduction in "unearned premium reserves" otherwise required by section 832, Subtitle A, IRC;
> (d)   the taxpayer is not – solely because of its becoming, on January 1, 1987, an "Existing Blue Cross or Blue Shield organization" as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC – subject to the adjustments set forth in section 481, Subtitle A, IRC;
> (e)   <u>the taxpayer's January 1, 1987 loss reserve for incurred-but-not-paid claims will be determined in accordance with actual claims paid data for 1987</u>; and
> (f)   for the purposes of section 1011, Subtitle A, IRC, the adjusted bases of all the taxpayer's assets shall be the respective fair market value of the individual assets as of January 1, 1987.

(emphases added).  Further, paragraph (4) of the Closing Agreement states that BCW was "deemed to have the following net operating loss carryovers, no elements of which are deemed to be attributable to any specific loss or deduction"; the enumerated net operating loss carryovers for 1984, 1985, and 1986 sum to $25,000,000.

Pursuant to its interpretation of the Closing Agreement, BCW computed its unpaid loss reserve[2] for 1987 to be $42,267,000, based on the claims it actually paid out during that year.  The use of actual claims paid figures was a departure from what the Government contends is the ordinary practice, in which Blue Cross organizations use the estimate generated at the start of a given year to calculate their deductions.  See I.R.C. § 846(b)(1) (2000).  (For purposes of this appeal, BCW does not challenge the Government's claim that the Internal Revenue Code ordinarily mandates the use of the estimate.)  At the beginning of 1987, BCW had overestimated its unpaid loss reserve by a considerable margin in comparison with the amount it ultimately paid out during that year.  Therefore, BCW's deduction derived from the actual claims paid data was approximately $37,000,000 greater than it would have been based on the estimate. The IRS ultimately ordered BCW to pay the larger amount derived from the use of the estimate.

BCW filed suit in the Court of Federal Claims, seeking, inter alia, a refund of the difference between its tax liability calculated using the estimate and its liability derived

---

[2]     "Unpaid loss reserve" refers to the amount of money the company will need to satisfy its incurred-but-not-paid claims, plus an estimate of the administrative costs to process these claims.  At the end of each year, BCW generates an actuarial estimate of its unpaid loss reserve.  "Incurred-but-not-paid claims" are claims that have been reported to the insurer as of a certain date but not paid, plus claims that have been incurred but not yet reported.  Insurance companies are allowed a tax deduction for losses incurred, which include the change in unpaid losses during the taxable year. See I.R.C. §§ 832(b)(5)(A)(ii), 832(c)(4) (2000).

from the actual claims paid figures. Both parties moved for partial summary judgment regarding the method that BCW should use to calculate its losses incurred deduction.

In support of their motions, the parties advanced their respective interpretations of the Closing Agreement. BCW asserted that the Closing Agreement unambiguously permitted the company to use its actual claims paid data to calculate its 1987 deduction under § 832(c)(4). The Government contended that the Closing Agreement had to be viewed in the context of the negotiations that led to its signing, which show that the IRS never agreed to any change in BCW's § 832(c)(4) deduction.

Holding that the language of the agreement had an unambiguous meaning, the court declined to rely on the extrinsic evidence put forth by the parties. In the court's view, the provisions of paragraph (3) were a laundry list of characteristics that applied to BCW under § 833 because it was, as the agreement declared, an "existing Blue Cross or Blue Shield organization" as of January 1, 1987. The court reasoned that the words "[a]s such," which appear after "existing Blue Cross or Blue Shield organization, as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC[,]" indicate that the information that follows is simply a list of attributes of such an organization. According to the court, "['as such'] can only be interpreted to mean that, as an entity qualifying under IRC § 833, the plaintiff has the following attributes." Blue Cross, 56 Fed. Cl. at 714. Moreover, § 833 is the only code section that is mentioned in the introduction to paragraph (3), and, in the court's view, the other provisions of paragraph (3) all relate to § 833 or Tax Reform Act § 1012, which is the public law that enacted § 833. Thus, the use of "[a]s such," the mention of § 833 alone in the introduction to paragraph (3), and the apparent relationship of all the other provisions of paragraph (3) to § 833 convinced

04-5028                                    4

the Court of Federal Claims that paragraph (3)(e) must have referred to § 833. The court further explained that, specifically, paragraph (3)(e) referred to the "special deduction" available to Blue Cross and Blue Shield organizations under § 833(b).[3]

---

[3]    Id. at 717-18.
I.R.C. § 833, "Treatment of Blue Cross and Blue Shield organizations, etc.," reads in pertinent part:
> (a) General rule.--In the case of any organization to which this section applies--
> (1) Treated as stock company.--Such organization shall be taxable under this part in the same manner as if it were a stock insurance company.
> (2) Special deduction allowed.--The deduction determined under subsection (b) for any taxable year shall be allowed.
> . . .
> (b) Amount of deduction.--
> (1) In general.--Except as provided in paragraph (2), the deduction determined under this subsection for any taxable year is the excess (if any) of--
> (A) 25 percent of the sum of--
> (i) the claims incurred during the taxable year and liabilities incurred during the taxable year under cost-plus contracts, and
> (ii) the expenses incurred during the taxable year in connection with the administration, adjustment, or settlement of claims or in connection with the administration of cost-plus contracts, over
> (B) the adjusted surplus as of the beginning of the taxable year.
> (2) Limitation.--The deduction determined under paragraph (1) for any taxable year shall not exceed taxable income for such taxable year (determined without regard to such deduction).
> (3) Adjusted surplus.--For purposes of this subsection--
> (A) In general.--The adjusted surplus as of the beginning of any taxable year is an amount equal to the adjusted surplus as of the beginning of the preceding taxable year--
> (i) increased by the amount of any adjusted taxable income for such preceding taxable year, or
> (ii) decreased by the amount of any adjusted net operating loss for such preceding taxable year.
> (B) Special rule.--The adjusted surplus as of the beginning of the organization's 1st taxable year beginning after December 31, 1986, shall be its surplus as of such time. For purposes of the preceding sentence and subsection (c)(3)(C), the term "surplus" means the excess of the total assets over total liabilities as shown on the annual statement.

I.R.C. § 833(a)-(b) (2000).

The court entered final judgment against BCW after the company stipulated to dismissal of the remaining issues. BCW filed a timely appeal to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

BCW appeals the Court of Federal Claims' grant of summary judgment in favor of the United States, which was based on the court's interpretation of the Closing Agreement.

A. Standard of Review

Contract interpretation is an issue of law that this court reviews de novo. Giove v. Dep't of Transp., 230 F.3d 1333, 1340 (Fed. Cir. 2000); Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 751 (Fed. Cir. 1999). The court also reviews a grant of summary judgment by the Court of Federal Claims de novo. Berkley v. United States, 287 F.3d 1076, 1083 (Fed. Cir. 2002). Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

B. Arguments

BCW argues that the Court of Federal Claims erred in holding that paragraph (3)(e) of the Closing Agreement unambiguously refers to I.R.C. § 833(b). It asserts that the record clearly establishes that neither party intended that paragraph to refer to § 833(b), and that therefore such an interpretation is impermissible. BCW further claims that the only reasonable conclusion to draw from the extrinsic evidence is that the IRS, like BCW, understood (or should have understood) paragraph (3)(e) to

refer to the § 832(c)(4) losses incurred deduction. Likewise, BCW says, the Closing Agreement on its face unambiguously implicates § 832(c)(4).

The Government defends the Court of Federal Claims' view that the contractual language of paragraph (3)(e), on its face, cannot reasonably be understood to refer to § 832(c)(4) and must instead refer to § 833. Alternatively, the Government contends, extrinsic evidence of negotiations establishes that paragraph (3)(e) concerns § 833, not § 832(c)(4). These negotiations were directed toward resolving whether BCW was tax-exempt in 1985 and 1986. According to the Government, the subject of "losses incurred" deductions never came up in those negotiations. And, although the Government apparently concedes that BCW intended paragraph (3)(e) to refer to § 832(c)(4), it argues that BCW kept that understanding secret from the IRS in an effort to "hornswoggle" the agency.

### C. Analysis

This case is principally a matter of contract interpretation. Closing agreements are interpreted pursuant to general principles of contract law. <u>Marathon Oil Co. v. United States</u>, 42 Fed. Cl. 267, 274 (1988).

### 1. Plain Meaning

Where contractual language is unambiguous, extrinsic evidence plays no role in determining the contract's meaning. <u>Coast Fed. Bank, FSB v. United States</u>, 323 F.3d 1035, 1037 (Fed. Cir. 2003). "A contract is ambiguous only when it is susceptible to two reasonable interpretations." <u>A-Transport Northwest Co., Inc. v. United States</u>, 36 F.3d 1576, 1584 (Fed. Cir. 1994). In the event that a contract has two or more reasonable interpretations, extrinsic evidence can be relied upon to determine the parties' intentions

at the time of contract formation.  See Sylvania Elec. Prods., Inc. v. United States, 458 F.2d 994, 1005 (Ct. Cl. 1972).

We hold that the contractual language at issue here is ambiguous.  We understand the Court of Federal Claims' reliance on the phrase "[a]s such," but we are unable to accord it the same level of clarity—in our view, this phrase is commonly, but not always, used to introduce a series of characteristics that necessarily apply to a previously mentioned thing (here, an "existing Blue Cross or Blue Shield organization") simply because it is that thing.  Occasionally, the phrase is used in a way that does not introduce necessarily applicable characteristics.  It can be used in a manner akin to "bearing that in mind," or similar phrases, to indicate that what follows happens to be a characteristic of the previously mentioned thing, but is not necessarily so simply by virtue of being that thing.  It can also be used as an essentially generic transitional phrase.[4]  Thus, the phrase may have the meaning the court gave it, or it may not—it is ambiguous and does not mandate a particular interpretation of paragraph (3)(e).  Moreover, reasonable minds could disagree with the court's construction of paragraph (3)(e)'s reference to "incurred-but-not-paid claims" as connected to § 833(b), because the concept of "incurred-but-not-paid claims" is clearly, albeit indirectly, involved in

---

[4]    For example, the Supreme Court has used "as such" as a generic transitional phrase in recent cases.  See Scarborough v. Principi, 124 S. Ct. 1856, 1872 (2004) ("The EAJA requirement for filing a timely fee application with the statutorily prescribed content is a condition on the United States' waiver of sovereign immunity in § 2412(d)(1)(A).  As such, the scope of the waiver must be strictly construed." (internal citations omitted)); United States v. Galletti, 124 S. Ct. 1548, 1551 (2004) ("The Court of Appeals held that since respondents are 'taxpayers' under § 7701(a)(14), which defines 'taxpayer' to mean 'any person subject to any internal revenue tax,' they are also 'taxpayers' under §§ 6203 and 6501.  As such, the Court of Appeals held that '[t]he assessment against the Partnership extended the statute of limitations only with respect to the Partnership.'").

§ 832. <u>See</u> I.R.C. § 832(c) (2000) ("In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions . . . losses incurred, as defined in subsection (b)(5) of this section . . . ."); <u>id.</u> § 832(b)(5) (defining "losses incurred" to include discounted unpaid losses outstanding at the end of the taxable year minus discounted unpaid losses outstanding at the end of the previous taxable year); <u>id.</u> § 846 (providing that "discounted unpaid losses" are derived from "undiscounted unpaid losses," which are "the unpaid losses shown in the annual statement"—i.e., the estimate of incurred-but-not-paid claims, adjusted for expenses).

On the other hand, we also are not persuaded by BCW's contention that paragraph (3)(e) unambiguously empowers it to calculate its unpaid loss reserve for its § 832(c)(4) deduction based on actual claims paid data. Paragraph (3) mentions § 833 and describes several of the statute's provisions, while it makes no mention of § 832 and is arguably at odds with both the "[a]s such" language and the specified $25,000,000 deduction in paragraph (4). In fact, even BCW suggests the need to turn to extrinsic evidence when it asserts that "[t]he language of the contract 'must be given that meaning that would be derived from the contract by a reasonably intelligent person <u>acquainted with the contemporaneous circumstances</u>.'" (Emphasis added.) Nonetheless, our opinion is not based on BCW's present belief about the clarity of the agreement, whatever it may be, but on the agreement itself. For the reasons indicated above, we hold that the agreement is facially unclear and must be construed in light of extrinsic evidence.

## 2. Extrinsic Evidence

On remand, one issue before the court will be the meaning that should be attributed to the Closing Agreement in light of the extrinsic evidence. Both parties have presented a considerable amount of extrinsic evidence to this court in their briefs. For example, BCW points out that it insisted on the inclusion of paragraph (3) during the negotiations. However, if paragraph (3)(e) referred to I.R.C. § 833(b), then that contract provision would have <u>decreased</u> BCW's deduction, and BCW would never have pressed for a provision that had such an effect. The Government, meanwhile, offers the correspondence between BCW and the IRS during negotiations to show that the IRS negotiator was never given reason to think that paragraph (3)(e) referred to § 832(c)(4). Our point here is not to give credence to the extrinsic evidence of one side or the other; that is not our role in this type of appeal. Instead, we simply hold that the contract is ambiguous and that the matter must be remanded for consideration of the extrinsic evidence by the trier of fact. <u>See, e.g.</u>, <u>Beta Sys., Inc. v. United States</u>, 838 F.2d 1179, 1183 (Fed. Cir. 1988); 4 S. Williston, <u>Williston on Contracts</u> § 616 (3d ed. 1961) ("The general rule is that interpretation of a writing is for the court. . . . Where, however, the meaning of a writing is uncertain or ambiguous, and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury."); 3 A.L. Corbin, <u>Corbin on Contracts</u> § 554 (1960) ("The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law.").

In interpreting the Closing Agreement on remand, the court may also wish to consider whether BCW knew or should have known of the IRS's interpretation of the

agreement when it was concluded. The meaning the IRS assigns to paragraph (3)(e) could prevail if, at the time the agreement was made, BCW knew or should have known how the IRS understood the provision and did nothing to correct that misunderstanding. Perry & Wallis, Inc. v. United States, 427 F.2d 722, 725 (Ct. Cl. 1970); Restatement (Second) of Contracts § 201(2) (1981); see also HPI/GSA 3C, LLC v. Perry, 364 F.3d 1327, 1335 (Fed. Cir. 2004) (characterizing the rule that "a party that enters without objection into a contract with knowledge of the other party's reasonable interpretation is bound by that interpretation" as "an unassailable rule of contract law"). Some information presented by the IRS suggests that this may have been the case. However, based on the evidence before us, we are unable to determine what BCW knew or should have known when the closing agreement was signed. That determination is for the Court of Federal Claims to make on remand.

It is also possible that, on remand, the extrinsic evidence will show neither that the parties shared a common understanding of the Closing Agreement nor that BCW had reason to know of the IRS's interpretation of it and did nothing to correct that understanding. In such a case, the Restatement prescribes that neither side's interpretation controls. Restatement (Second) of Contracts § 201(3). "The result may be an entire failure of agreement or a failure to agree as to a term. There may be a binding contract despite failure to agree as to a term, if the term is not essential or if it can be supplied." Id. § 201, cmt. (d).

In the event that the evidence on remand shows that there was a failure of assent regarding paragraph (3)(e), there are three possible outcomes. If paragraph (3)(e) is not essential, the remainder of the agreement stands. If it is essential, either

the court can supply a term that is "reasonable in the circumstances[,]" <u>id.</u> § 204, or, if that is not feasible, then the entire agreement fails.

CONCLUSION

For the reasons stated above, we reverse the Court of Federal Claims' grant of summary judgment for the United States and remand for consideration of extrinsic evidence.