**BLUE CROSS & BLUE SHIELD UNITED OF WISCONSIN & SUBSIDIARIES, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 98–727T.**

United States Court of Federal Claims.

June 29, 2006.

Timothy G. Schally, Michael Best & Friedrich LLP, Milwaukee, Wisconsin, for the plaintiff. Robert Gordon, Michael Best & Friedrich LLP, Milwaukee, Wisconsin, of counsel.

Mary M. Abate, Tax Division; Eileen J. O'Connor, Assistant Attorney General, United States Department of Justice, for the defendant.

## OPINION

HORN, Judge.

This tax case was brought by Blue Cross & Blue Shield United of Wisconsin (BCW), the common parent company of a group of affiliated taxable insurance and service corporations during the period at issue in this case. In a previous opinion, this court granted partial summary judgment for the government. *See Blue Cross & Blue Shield United of Wis. & Subsidiaries v. United States (Blue Cross I)*, 56 Fed.Cl. 697 (2003). Following that decision, the parties entered into a stipulation for partial dismissal and for entry of judgment of the remaining issues in the case, those not the subject of the court's opinion. *See Blue Cross & Blue Shield United of Wis. & Subsidiaries v. United States (Blue Cross II)*, No. 98–727T, 2003 WL 22327886 (Fed.Cl. Sept.3, 2003). On appeal from the court's decision granting summary judgment for the defendant, the United States Court of Appeals for the Federal Circuit reversed in part and remanded the case in order for this court to consider extrinsic evidence. *See Blue Cross & Blue Shield United of Wis. & Subsidiaries v. United States (Blue Cross III)*, 117 Fed.Appx. 89, 94 (2004).

## FINDINGS OF FACT

The facts and background of this case were set forth in detail in the court's previous opinion. *See Blue Cross I*, 56 Fed.Cl. at 698–702. For this reason, only a summary of the facts previously determined by this court are presented here. The facts detailed in the court's earlier opinion are incorporated into this opinion. At issue is the calculation of BCW's Internal Revenue Code (IRC) section 832(c)(4) losses incurred deduction for tax year 1987. *See* 26 U.S.C. § 832(c)(4) (1982 & Supp. V 1987) (hereinafter IRC § 832(c)(4)). As stated in IRC § 832(b)(5), in order to calculate its IRC § 832(c)(4) losses incurred deduction, BCW must determine the amount of its "unpaid losses," or its "loss reserve." Loss reserves are defined as "estimates of amounts insurers will have to pay for losses that have been reported but not yet paid, for losses that have been incurred but not yet reported, and for administrative costs of re-

solving claims." *Atl. Mut. Ins. Co. v. Comm'r,* 523 U.S. 382, 384, 118 S.Ct. 1413, 140 L.Ed.2d 542 (1998).

The dispute between the parties is the method to be employed to determine BCW's loss reserve for unpaid claims as of December 31, 1986. The plaintiff, BCW, contends that it should compute "its opening 1987 loss reserve for unpaid claims" using its "actual claims paid" data for 1987, that is, "the actual amounts paid out during 1987 in satisfaction of [BCW's] unpaid claims as of January 1, 1987." The defendant, however, maintains that the loss reserve for unpaid claims as of December 31, 1986 should be computed using the actuarial estimate of BCW's unpaid loss reserve, as reported on the company's annual statement. *See Blue Cross I,* 56 Fed.Cl. at 698.

On May 15, 1986, the plaintiff filed with the IRS Form 990, "Return of Organization Exempt from Federal Income Tax," for the year ending December 31, 1985 (tax year 1985). On this return, the plaintiff stated that it was filing as an organization exempt from federal income tax pursuant to IRC § 501(c)(4). On September 15, 1987, the plaintiff filed with the IRS two "U.S. Corporation Income Tax Returns" (Forms 1120), one for its tax year 1985 and a consolidated tax return [1] for its tax year 1986. The Form 1120 for tax year 1985 was intended to replace the Form 990 previously filed for 1985. In an attachment to the newly filed 1985 Form 1120, the plaintiff explained that it filed the new Form 1120 returns for tax years 1985 and 1986 on September 15, 1987, because, according to BCW, "the aggregate, incremental changes in its operations that had occurred during the years prior to 1985 had been so material that, as of January 1, 1985, BCW no longer qualified for exemption under IRC § 501(c)(4)." *Blue Cross I,* 56 Fed.Cl. at 698.

On the newly filed 1985 Form 1120, the plaintiff reported a net operating loss (NOL) of $36,887,982.00, which included a $5,450,687.00 NOL carryover from earlier years. The newly filed Form 1120 for tax year 1986 indicated a consolidated NOL for 1986 of $85,943,938.00, which was comprised of an $80,013,968.00 NOL for BCW, and $5,929,970.00 for the other related corporations. The $80,013,968.00 NOL claimed by BCW included the $36,887,982.00 NOL carried over from tax year 1985.

In September, 1988, the IRS District Director of the Milwaukee, Wisconsin District submitted a Request for Technical Advice from the IRS Assistant Commissioner (Technical), in Washington, D.C. The principal question presented in the Request for Technical Advice was whether BCW could revoke its tax exempt status under IRC § 501(c)(4) on September 15, 1986, effective for tax years beginning after December 31, 1984. *See Blue Cross I,* 56 Fed.Cl. at 699. By a letter dated July 24, 1991, the IRS issued a Technical Advice Memorandum, concluding that BCW was tax-exempt under IRC § 501(c)(4) for tax years 1985 and 1986. *Id.* In addition, on July 28, 1991, the IRS Chief Counsel's office issued a General Counsel Memorandum, concurring in the conclusion that Blue Cross organizations were tax exempt. *Id.*

To resolve the dispute between BCW and the IRS, a settlement was reached, which included a Closing Agreement between BCW and the IRS. The agreement was executed on January 22, 1993, by C. Edward Mordy, Vice President of BCW, and on April 27, 1993, by Timothy I. Gukich, the IRS Associate Chief of Milwaukee Appeals, for the Commissioner of the IRS.

With respect to BCW's taxable status for tax years 1985 and 1986, the Closing Agreement stated that BCW would be considered tax-exempt during 1985 and 1986: "NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes that: (1) Prior to 1987, the taxpayer was, per section 501, Subtitle A, IRC, an organization

---

1. The 1986 Form 1120 was a "consolidated tax return" in that BCW reported as the parent corporation of an affiliated group of corporations that included Compcare Health Services Insurance Corporation (CHSIC) and United Wisconsin Services, Inc. (UWS) (each of which was a whol-

ly-owned subsidiary of BCW), and United Wisconsin Life Insurance Company (UWLIC), United Wisconsin Insurance Company (UWIC), Leasing Unlimited, Inc. (LUI), and Proservices (each of which were wholly-owned subsidiaries of UWS).

exempt from taxation." Despite the statement in the Closing Agreement that the plaintiff would be considered a tax-exempt entity for tax years 1985 and 1986, in the Closing Agreement, BCW was permitted a $25,000,000.00 NOL for tax years 1984, 1985, and 1986, which could be carried over to 1987 and later years.

Subparagraph (e) of paragraph 3 of the Closing Agreement is the portion of the Closing Agreement at issue in this case. That paragraph states:

(3) As of January 1, 1987, the taxpayer was an "Existing Blue Cross or Blue Shield organization" as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC. As such, the following attributes apply to the taxpayer as of that date: ... (e) the taxpayer's January 1, 1987 loss reserve for incurred-but-not-paid claims will be determined in accordance with actual claims paid data for 1987[.]

On its original 1987 return, BCW claimed an IRC § 832(c)(4) deduction for "losses incurred" in the amount of $190,155,418.00. To arrive at that number, BCW determined its "discounted unpaid losses outstanding at the end of 1986" to be $85,352,778.00. According to BCW, it calculated this number by:

(a) starting with the estimate of the amount needed to satisfy total claims unpaid as of that date, as reported on its 1986 Annual Statement for 1986 ($78,421,-394.00);[2] (b) adding estimated loss adjustment expenses ($9,953,826.00); and (c) multiplying the total of (a) and (b) by .9658, the discounting factor to be applied pursuant to IRC § 846.

In a "Statement Attached to and Made Part of" the original 1987 return, BCW stated that it had increased the amount of its unpaid loss reserve from 1985 to 1986, but that the increase did not constitute "reserve strengthening," as follows:

During calendar year 1986, the Taxpayer and certain of its subsidiaries had additions to reserve attributable to an increase in estimate of reserves established for pri-

or accident years as well as an increase in the estimate for the 1986 accident year. These increases were necessary and customary in its determination of unpaid loss reserves.

The Taxpayer believes these additions to the reserves are reasonable additions representing actual unpaid losses which do not constitute "reserve strengthening" under the Act [the Tax Reform Act of 1986], even though these additions might otherwise constitute reserve strengthening as it was defined in Internal Revenue Service Advance Notice 88–100[, 1988 WL 561166]. Accordingly, the Taxpayer has not taken into account, in determining taxable income, the difference between the undiscounted and the discounted unpaid losses at the end of 1986.

After BCW submitted its return, the IRS District Director of the Milwaukee District initiated an audit of the consolidated income tax returns filed by plaintiff for tax years 1987–1989. On August 1, 1993, BCW filed a second federal income tax return, Form 1120, for tax year 1987 with the revenue agent who had already begun an audit of the original returns filed by BCW for 1987–1989. The plaintiff stated that it provided "a revised Form 1120 for Plaintiff's tax year 1987, which the Examining Agent treated as an amended return." *Blue Cross I,* 56 Fed.Cl. at 700.

On the amended Form 1120 for 1987, BCW recomputed its taxable income, modifying the IRC § 832(c)(4) deduction for "losses incurred" to $227,372,878.00, an increase of $37,217,460.00 over the deduction for "losses incurred" claimed on the original 1987 return ($190,155,418.00). *Id.* According to the plaintiff, the Closing Agreement required BCW to use its "actual claims paid data," in lieu of the actuarial estimate that appears on the 1986 Annual Statement, to compute its "opening 1987 unpaid loss reserve." To arrive at the new deduction of $227,372,878.00, BCW amended its "discounted unpaid losses outstanding at the end of 1986" to

**2.** In February, 1987, BCW filed with the Office of the Commissioner of Insurance (OCI) of Wisconsin and with the National Association of Insurance Commissioners (NAIC) its 1986 Annual

Statement, which stated that its total claims unpaid (undiscounted unpaid losses, excluding the loss adjustment expense reserve) as of December 31, 1986 were $78,421,394.00.

$43,483,840.00, a decrease of $41,868,938.00 below the $85,352,778.00 previously reported on BCW's original Form 1120 return for 1987. According to BCW, it computed the new $43,483,840.00 number by:

> (a) starting with the amount actually paid during 1987 on claims that were incurred but not paid as of January 1, 1987, as reported on the 1987 Annual Statement ($42,267,000.00);[3] (b) adding loss adjustment expenses ($2,756,649.00); and (c) multiplying the total of (a) and (b) by .9658, the discounting factor to be applied pursuant to IRC § 846.

During the audit of the 1987–1989 returns, the IRS disallowed BCW's modified figure for the unpaid loss reserve outstanding as of December 31, 1986, which appeared on the 1987 amended return. In other words, BCW was not permitted to determine its loss reserve for unpaid claims as of December 31, 1986 "in accordance with actual claims paid data."

Upon the conclusion of the audit adjustments for tax year 1987 for all the related entities, the IRS computed the consolidated taxable income and tax deficiency. In the computation, pursuant to the Closing Agreement, BCW was accorded a $25,000,000.00 NOL carryover from 1986, and a $17,650,879.00 "special deduction" under IRC § 833(b), resulting in no taxable income for 1987. However, BCW did incur tax liability for 1987 in the amount of $514,459.00, which consisted of an alternative minimum tax in the amount of $487,603.00, and an environmental tax of $26,856.00.

Since BCW and its subsidiaries had already paid a certain amount of tax with the 1987 amended return, the IRS' Notice of Deficiency mailed March 31, 1994 asserted a tax deficiency for 1987 in the amount of $430,350.00. In this notice, the IRS asserted

that BCW's unpaid loss reserve as of December 31, 1986, was $80,679,096.00. According to the plaintiff, this amount was computed by "(a) starting with the amount of total claims unpaid, as reported on the 1987 Annual Statement ($78,421,394.00); (b) adding loss adjustment expenses ($5,114,635.00); and (c) multiplying the total of (a) and (b) by .9658, the discounting factor to be applied pursuant to IRC Section 846."

On or about August 19, 1994, plaintiff paid $790,812.17 to the IRS, representing the assessed tax deficiency ($430,350.00) and the assessed interest ($360,462.17) for 1987. On September 15, 1994, BCW and its subsidiaries filed a timely refund claim for tax year 1987 in the amount of $874,921.17 (tax of $514,459.00 plus interest paid of $360,462.17). In the 1987 refund claim, BCW maintained that, pursuant to statute and the terms of the Closing Agreement, it was permitted to determine its loss reserve for unpaid claims as of December 31, 1986 in accordance with actual claims paid data for 1987. In the refund claim, BCW computed its "opening 1987 loss reserve" to be $45,023,649.00. Therefore, according to the plaintiff, its losses incurred deduction for the 1987 taxable year should be increased by $37,195,256.00.[4]

In a letter dated March 29, 1996, the Milwaukee Appeals Office of the IRS disallowed the 1987 refund claim in full. Pursuant to IRC § 6532, in 1998, the plaintiff and the Regional Director of Appeals executed Form 907, agreeing that plaintiff was entitled to bring suit to recover on the refund claims on or before December 31, 1998. The plaintiff timely commenced this action for refund under IRC §§ 7422 and 6532.

## DISCUSSION

In this court's previous opinion in this case, the court found the language of the

---

3. In February, 1988, BCW filed its annual statement for 1987 with both the NAIC and OCI. As described by the plaintiff, on the second Form 1120 for 1987, in order to calculate its discounted unpaid losses at the end of 1986, the plaintiff employed "the amount actually paid during 1987 on total claims that were unpaid as of December 31, 1986 [,which] was $42,267,000," as reported on its 1987 annual statement.

4. The plaintiff apparently arrived at this figure by calculating the difference between $83,536,029.00 and $45,023,649.00, with appropriate discounting. The plaintiff employed $83,536,029.00 as the IRS-determined unpaid loss reserve as of December 31, 1986, not $80,679,096.00, the number the IRS claimed to be the correct amount in its March 31, 1994 notice.

Closing Agreement to be unambiguous and that the specification found in paragraph (3)(e) of the Closing Agreement applied to BCW only under IRC § 833 because BCW was "an Existing Blue Cross or Blue Shield organization" as of January 1, 1987. *Blue Cross I*, 56 Fed.Cl. at 714. Specifically, the court found that "Paragraph (3) [of the Closing Agreement] is a recitation of the provisions under IRC § 833." *Id.* Paragraph (3) of the Closing Agreement reads: "As of January 1, 1987, the taxpayer was an 'Existing Blue Cross or Blue Shield organization' as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC. As such, the following attributes apply." The court found that:

> After identifying the plaintiff as an "Existing Blue Cross or Blue Shield organization" under IRC § 833, the introductory language states, "[a]s such;" this language can only be interpreted to mean that, as an entity qualifying under IRC § 833, the plaintiff has the following attributes. Furthermore, one of the "attributes" applied to entities qualifying under IRC § 833 is the special deduction under IRC § 833, which is unique to "Existing Blue Cross or Blue Shield Organizations." In contrast, the IRC § 832(c)(4) deduction applies to all Plaintiff & C insurance companies, not just Blue Cross or Blue Shield organizations; thus, the IRC § 832(c)(4) deduction would not logically be included in a recitation of the "attributes" of Blue Cross or Blue Shield Organizations. In short, the introductory language of paragraph (3) leads to the conclusion that subparagraph 3(e) is referring to IRC § 833, not IRC § 832(c)(4).

*Blue Cross I*, 56 Fed.Cl. at 714.

The United States Court of Appeals for the Federal Circuit disagreed with this court's finding, holding that the language of the Closing Agreement was ambiguous. The Federal Circuit stated that:

> We understand the Court of Federal Claims' reliance on the phrase "[a]s such," but we are unable to accord it the same level of clarity-in our view, this phrase is commonly, but not always, used to introduce a series of characteristics that neces-

sarily apply to a previously mentioned thing (here, an "existing Blue Cross or Blue Shield organization") simply because it is that thing. Occasionally, the phrase is used in a way that does not introduce necessarily applicable characteristics.

*Blue Cross III*, 117 Fed.Appx. at 93. The Federal Circuit also stated, however, that "[o]n the other hand, we also are not persuaded by BCW's contention that paragraph (3)(e) unambiguously empowers it to calculate its unpaid loss reserve for its § 832(c)(4) deduction based on actual claims paid data." *Id.* The Federal Circuit, therefore, remanded this case for consideration of extrinsic evidence.

In its remand, the Federal Circuit directed this court to consider "whether BCW knew or should have known of the IRS's interpretation of the agreement when it was concluded." *Id.* at 94. The Federal Circuit stated that:

> The meaning the IRS assigns to paragraph (3)(e) could prevail if, at the time the agreement was made, BCW knew or should have known how the IRS understood the provision and did nothing to correct that misunderstanding. *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 427 F.2d 722, 725 (1970); *Restatement (Second) of Contracts* § 201(2) (1981); *see also HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1335 (Fed.Cir.2004) (characterizing the rule that "a party that enters without objection into a contract with knowledge of the other party's reasonable interpretation is bound by that interpretation" as "an unassailable rule of contract law").

*Blue Cross III*, 117 Fed.Appx. at 94.

Although the Federal Circuit did not articulate the point, this rule may apply equally to the government; i.e., that the meaning BCW assigns to paragraph (3)(e) could prevail if, at the time the agreement was made, the government knew or should have known how BCW understood the provision and did nothing further.

Remanding for a review of extrinsic evidence, the Federal Circuit also recognized that, in the event that the evidence on remand shows that there was a failure of as-

sent regarding paragraph 3(e) of the Closing Agreement, there are three possible outcomes: 1) if paragraph 3(e) is not essential, then the remainder of the agreement stands; 2) if paragraph 3(e) is essential, either the court can supply a term that is reasonable under the circumstances, or 3) if the court cannot supply a reasonable term, then the entire agreement fails. *See Blue Cross III,* 117 Fed.Appx. at 95. The Federal Circuit, therefore, remanded this case for the limited purpose of determining whether extrinsic evidence in this case explains the ambiguous terms of the Closing Agreement and whether one or both parties understood the meaning and interpretation the other party had of paragraph 3(e) of the Closing Agreement.

On remand, this court heard testimonial evidence from the key personnel involved in the negotiations between BCW and the IRS leading up to the Closing Agreement. For BCW, Randall Wichinski, Thomas Alberte and C. Edward Mordy took the stand. At the time that the Closing Agreement was negotiated between BCW and the IRS, Mr. Wichinski was a partner at the accounting firm of Ernst & Young and was BCW's "exclusive representative" for all contacts with the IRS throughout the period during which the Closing Agreement was negotiated. Thomas Alberte was BCW's tax manager, who assisted Mr. Wichinski in some of the negotiations to finalize the Closing Agreement between the IRS and BCW. C. Edward Mordy was the Vice President and Chief Financial Officer of BCW from 1987 through 1999, and was the individual who signed the Closing Agreement on behalf of BCW.

The key individuals on behalf of the government included Vernon Los, Roger Laur and Timothy Gukich. Vernon Los was an Appeals Officer with the Milwaukee, Wisconsin Appeals office of the IRS and was assigned to work on BCW's tax appeals. Mr. Los, although the government's primary negotiator for the Closing Agreement, did not have the authority to sign a Closing Agreement for the IRS. Roger Laur reviewed the Closing Agreement in the Milwaukee Appeals Office for compliance with procedural requirements of the Internal Revenue Manual. Mr. Laur also was not authorized to sign Closing Agreements on behalf of the IRS. Timothy Gukich was the Associate Chief of the Milwaukee Appeals Office when the Closing Agreement between BCW and the IRS was signed. Mr. Gukich was authorized to and did sign the Closing Agreement at issue in this case.

## A. The Scope of Remand—Interpreting the Closing Agreement

Based on the extrinsic evidence produced during the remand proceedings, this court reviews the words of the Closing Agreement signed by the plaintiff and the IRS. Closing agreements are governed by IRC § 7121, which authorizes the IRS to enter into agreements in writing with taxpayers to determine their total tax liability for "any internal revenue tax for any taxable period." 26 C.F.R. § 301.7121-1 (1993). The statute also states that, if the agreement is approved by an authorized individual, "such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact-(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States[.]" 26 U.S.C. § 7121(b) (1988); *see also Crnkovich v. United States,* 202 F.3d 1325, 1331 (Fed.Cir.2000) ("Under I.R.C. § 7121(b), such an agreement is 'final and conclusive' and, absent 'fraud, malfeasance, or misrepresentation of a material fact,' may not be reopened or set aside."); *In re Spendthrift Farm, Inc.,* 931 F.2d 405, 407 (6th Cir.1991) ("'[C]losing agreements are binding on the parties as to the matters agreed upon and may not be modified or disregarded in any proceeding unless there is a showing of fraud, malfeasance, or misrepresentation of a material fact.").

Closing agreements are interpreted under ordinary contract principles, and, thus, can be viewed as binding contracts between the taxpayer and the IRS:

> Closing agreements are authorized, and limited by, the language of the statute. To the extent that the statute conflicts with general and otherwise governing contract law principles, the statute governs. But closing agreements are contracts nonethe-

less, and courts have repeatedly stated that, in analyzing closing agreements, the court must use ordinary contract principles. *Marathon Oil Co. v. the United States,* 42 Fed.Cl. 267, 274 (1998), *aff'd per curiam,* 215 F.3d 1343 (Fed.Cir.1999) (citing *United States v. Lane,* 303 F.2d 1, 4 (5th Cir.1962)); *Rink v. Comm'r,* 47 F.3d 168, 171 (6th Cir. 1995); *In re Spendthrift Farm, Inc.,* 931 F.2d at 407; *Smith v. United States,* 850 F.2d 242, 245 (5th Cir.1988). Otherwise stated, IRC § 7121 closing agreements "certainly are contracts in the ordinary legal sense of the term, because they contain binding promises. The government does not claim to be free to walk away from a closing agreement, and it certainly does not acknowledge the right of a taxpayer to do so." *United States v. Nat'l Steel Corp.,* 75 F.3d 1146, 1150 (7th Cir.1996) (Posner, J.).

In the case before this court, a Closing Agreement was executed by the parties in 1993. The Closing Agreement addressed the federal income tax status of BCW for tax years 1985 and 1986. The agreement states that BCW would be treated as a tax-exempt entity prior to 1987, and that it would gain NOL from pre–1987 tax periods in the amount of twenty-five million dollars, which could be carried over to 1987 and later years. The disputed provision of the Closing Agreement is subparagraph 3(e), which states:

> (3) As of January 1, 1987, the taxpayer was an "Existing Blue Cross or Blue Shield organization" as this term is defined in subparagraph (c)(2) of section 833, Subtitle A, IRC. As such, the following attributes apply to the taxpayer as of that date:
> . . .
> (e) the taxpayer's January 1, 1987 loss reserve for incurred-but-not-paid claims will be determined in accordance with actual claims paid data for 1987[.]

▬ It is a fundamental precept of the common law that the intention of the parties to a contract controls its interpretation. *See Beta Systems Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988) (quoting *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971)); *Alvin v. United States Postal Service,* 816 F.2d 1562,

1565 (Fed.Cir.1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); *see also Flexfab, L.L.C. v. United States,* 424 F.3d 1254, 1262 (Fed.Cir.2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer [the IRS signing official]. . . ."). When the terms of a contract are clear and unambiguous, there is no need to resort to extrinsic evidence for its interpretation. *See Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1375 (Fed.Cir. 2004) ("If the terms of a contract are clear and unambiguous, they must be given their plain meaning—extrinsic evidence is inadmissible to interpret them."); *Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *see also King v. Dep't of Navy,* 130 F.3d 1031, 1033 (Fed.Cir.1997) ("If ambiguity is found, or if ambiguity has arisen during performance of the agreement, the judicial role is to implement the intent of the parties at the time the agreement was made."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Cruz–Martinez v. Dep't of Homeland Sec.,* 410 F.3d 1366, 1371 (Fed.Cir.2005) ("[M]eaning can almost never be plain except in a context" (quoting *Restatement (Second) of Contracts* § 212, cmt. b (1981))); *Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1375 (Fed.Cir.2004) (holding that extrinsic evidence is permissible to interpret an ambiguous contract); *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972); *Commonwealth Edison Co. v. United States,* 56 Fed.Cl. 652, 662 (2003).

▬ There is a limit, however, to the authority given to extrinsic evidence. For example, extrinsic evidence must be used to interpret an agreement in a manner that gives meaning to all its provisions. *See*

*McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (1996). Extrinsic evidence also "may not be used 'to justify reading a term into an agreement that is not found there.'" *Warren v. Office of Personnel Mgmt.*, 407 F.3d 1309, 1314 (Fed.Cir. 2005) (quoting *Fox v. Office of Personnel Mgmt.*, 100 F.3d 141, 145 (Fed.Cir.1996)); *see also McAbee Constr., Inc. v. United States*, 97 F.3d at 1434 ("[E]xtrinsic evidence . . . should not be used to introduce an ambiguity where none exists." (quoting *Interwest Constr. v. Brown*, 29 F.3d 611, 614 (1994))); *see also David Nassif Assocs. v. United States*, 214 Ct.Cl. 407, 423, 557 F.2d 249, 258 (1977) ("[T]he task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court.").

■ In its remand decision, the Federal Circuit found the Closing Agreement in this case to be ambiguous and directed this court to review the extrinsic evidence to determine the meaning of paragraph 3(e) of the Closing Agreement to determine whether either party "knew or should have known" how the other party interpreted the Closing Agreement. *See Blue Cross III*, 117 Fed.Appx. at 94 (citing *Perry & Wallis, Inc. v. United States*, 427 F.2d at 725; *Restatement (Second) of Contracts* § 201(2) (1981); *HPI/GSA 3C, LLC v. Perry*, 364 F.3d at 1335). In *Perry & Wallis, Inc. v. United States*, the United States Court of Appeals for the Federal Circuit stated that: "A party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretation and cannot later claim that it thought something else was meant." *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. at 314–15, 427 F.2d at 725 (citing *Franklin Co. v. United States*, 180 Ct.Cl. 666, 381 F.2d 416 (1967); *City of Memphis v. Ford Motor Co.*, 304 F.2d 845, 849 (6th Cir.1962); and *Cresswell v. United States*, 146 Ct.Cl. 119, 127, 173 F.Supp. 805, 811 (1959)); *see also United States v. Human Res. Mgmt. Inc.*, 745 F.2d 642, 649 (Fed.Cir.1984) ("Resources [the contractor] was aware when it signed the contract that the government viewed the provisional rates for overhead as providing a ceiling on those rates. Having thus acquiesced in that interpretation, Resources is bound by it."); *Franklin Co. v. United States*, 180 Ct.Cl. at 669, 381 F.2d at 418 ("courts have never completely shut their eyes to evidence of the parties' shared understanding drawn from the transaction's milieu or working-out."). In 2004, the Federal Circuit recognized as "an unassailable rule of contract law" the proposition that "a party that enters without objection into a contract with knowledge of the other party's reasonable interpretation is bound by that reasonable interpretation." *HPI/GSA 3C, LLC v. Perry*, 364 F.3d at 1335.

Following the Federal Circuit's remand to this court based on its finding that the contract was ambiguous, and with the benefit of reviewing the extrinsic evidence offered by the parties at the subsequent hearing, this court finds that during the negotiation proceedings of the Closing Agreement, BCW had articulated its interpretation of and intentions regarding paragraph 3(e) of the Closing Agreement to the IRS. Moreover, the IRS appears to have understood plaintiff's position during the negotiations and failed to provide extrinsic evidence that it did not understand BCW's interpretation, or that the IRS had rejected BCW's interpretation. In fact, the defendant presented little evidence as to its pre-signing interpretation of paragraph 3(e), other than to support BCW's claim that the IRS negotiating official understood BCW's position. For these reasons, the court finds that paragraph 3(e) of the Closing Agreement refers to IRC § 832(c)(4) and that BCW should be entitled to recalculate its January 1, 1987 loss reserve using actual claims paid data.

## B. The Statutes and Regulations

■ In the court's previous opinion, the court set forth the IRS statutes applicable to this case. A reiteration of those statutes is applicable here. IRC §§ 831 and 832 relate generally to the federal income taxation of property and casualty (P & C) insurance companies, which are non-life insurance companies, such as BCW. Pursuant to IRC § 831(a), for each taxable year, taxes are imposed on the "taxable income" of every P

& C insurance company. Section 832(a) of the IRC provides that "'taxable income' means the gross income as defined in subsection [IRC § 832](b)(1) less the deductions allowed by subsection (c)." Section 832(b)(1)(A) of the IRC states:

**(1) Gross income**

The term "gross income" means the sum of—

(A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners[.]

IRC § 832(b)(1)(A). "Underwriting income" is defined as "the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred." IRC § 832(b)(3). Section 832(c) of the IRC provides that: "In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions: ... (4) losses incurred, as defined in subsection (b)(5) of this section[.]"

Prior to the Tax Reform Act of 1986(TRA), P & C insurers were permitted a full deduction for loss reserves as "losses incurred." In each taxable year, in addition to the losses paid (with adjustments for salvage and reinsurance), the full amount of the loss reserve, reduced by the amount of the loss reserve claimed for the prior taxable year, was treated as a deductible business expense. 26 U.S.C. §§ 832(c)(4), 832(b)(5) (1982). As a result, a P & C insurer could "take, in effect, a current deduction for future loss payments without adjusting for the 'time value of money'—the fact that '[a] dollar today is worth more than a dollar tomorrow.'" *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. at 384, 118 S.Ct. 1413 (citations omitted).

Section 1023 of the TRA amended the IRC by adding a new section, IRC § 846. Section 846 of the IRC provides that, for taxable years beginning after December 31, 1986, P & C insurers were required to discount unpaid losses to present value when claiming

them as a deduction. However, without a transitional rule for the 1987 tax year, when computing the losses incurred deduction for that year, P & C insurers would have subtracted undiscounted year-end 1986 reserves from discounted year-end 1987 reserves, resulting in artificially low deductions. *Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. at 384, 118 S.Ct. 1413. The TRA alleviated this effect by requiring P & C insurers to discount 1986 reserves for purposes of the 1987 tax computation. *See* TRA § 1023(e); IRC § 846 note.

After the enactment of the TRA, IRC § 832(b)(5) "Losses Incurred" read in pertinent part:

**(A) In general**

The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(i) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(ii) To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses (as defined in section 846) outstanding at the end of the taxable year and deduct unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year.

**(B) Reduction of deduction**

The amount which would (but for this subparagraph) be taken into account under subparagraph (A) shall be reduced by an amount equal to 15 percent of the sum of—

(i) tax-exempt interest received or accrued during such taxable year, and

(ii) the aggregate amount of deductions provided by sections 243, 244, and 245 for—

(I) dividends (other than 100 percent dividends) received during the taxable year, and

(II) 100 percent dividends received during the taxable year to the extent attributable to prorated amounts.

In the case of a 100 percent dividend paid by an insurance company, the portion attributable to prorated amounts shall be determined under subparagraph (E)(ii).

IRC § 832(b)(5). Therefore, to calculate the "losses incurred" deduction, it is necessary to determine the amount of unpaid losses at both the end of the current taxable year and the end of the preceding taxable year. As noted above, "unpaid losses," or the loss reserve, generally refer to the unpaid losses reported on the NAIC annual statement filed by the taxpayer for the year ending with or within the taxable year of the taxpayer, plus the amount of estimated claim adjudication expenses.[5] IRC §§ 846(b), 846(f)(2) and 832(b)(6).

Finally, prior to the TRA, Blue Cross or Blue Shield organizations were tax-exempt organizations. As a result of the enactment of section 1012 of the TRA, Blue Cross or Blue Shield organizations became taxable entities, beginning with tax year 1987, as if they were regular P & C insurance companies under IRC §§ 831–835. Section 1012 of the TRA provided a new Code provision, IRC § 833, the provision through which Blue Cross or Blue Shield organizations became taxable entities.

IRC § 833 applies to "Existing Blue Cross or Blue Shield organizations," and to certain other organizations. An "Existing Blue Cross or Blue Shield organization" generally refers to any Blue Cross or Blue Shield organization which (a) was in existence on August 16, 1986; (b) was determined to be exempt from tax for its last taxable year beginning before January 1, 1987; and (c)

did not have a "material change" in operations or structure after August 16, 1986 and before the close of the taxable year. IRC § 833(c)(2). Organizations that meet this definition became subject to federal income tax, pursuant to IRC § 833, for taxable years beginning after December 31, 1986. Under IRC § 833(a)(1), any such organization is taxable under IRC § 831 et seq., "in the same manner as if it were a stock insurance company." However, IRC § 833 also accorded these organizations special income tax rules that were not available to other insurers subject to tax under IRC § 831. For instance, Blue Cross or Blue Shield organizations were permitted a "special deduction" under IRC § 833(b).

In this court's previous opinion, the court found that IRC §§ 832(b)(5) and 846 supported the defendant's position that, for the purpose of computing the IRC § 832(c)(4) losses incurred deduction, BCW is required to employ the estimate for unpaid losses that appears on BCW's annual statement. As noted, IRC § 832(c)(4) provides a deduction for "losses incurred, as defined in subsection (b)(5) of this section." Section 832(b)(5) of the IRC references IRC § 846, which outlines the discounting formula that should be applied to unpaid losses. Significantly, IRC § 846(b)(1) states that the "undiscounted unpaid losses," to which the discounting formula is applied, "means the unpaid losses shown in the annual statement filed by the taxpayer for the year ending with or within the taxable year of the taxpayer." In other words, for the purpose of computing the IRC § 832(c)(4) deduction, IRC § 832(b)(5), pur-

---

**5.** For purposes of the "losses incurred" deduction, the term, "unpaid losses," or "loss reserve," is an actuarially determined estimate, as of a point in time, and is comprised of three amounts that an insurer expects to pay on: (1) claims that have been reported, but not yet paid; plus (2) claims that have been incurred, but not yet reported; plus (3) an estimate of internal expenses that will be required to adjudicate the claims in the first two categories.

BCW annually determined its loss reserve as of December 31 in order to report that amount on the NAIC annual statement. However, the loss reserve is not reported as a single amount on the annual statement; rather, the loss reserve is divided into two constituent amounts on the annual statement. The first two "elements" of the

loss reserve (i.e., estimates of the amounts needed to pay claims that have been reported, but not yet paid and that have been incurred, but not reported, as of December 31 of each year) are added together and reported as the "total claims unpaid" on the annual statement. The third element of the loss reserve, unpaid loss adjustment expenses (i.e., an estimate of the internal costs required to adjudicate the "total claims unpaid"), also appears on the annual statement. *See* IRC § 846(f)(2). Therefore, the total claims unpaid and the unpaid loss adjustment expenses, as reported on the annual statement, must be added together to determine the amount of "unpaid losses" for purposes of the losses incurred deduction. *See id.*

suant to IRC § 846, requires the use of the unpaid losses outstanding at the end of the preceding taxable year, as shown on the annual statement. In the Closing Agreement, however, the parties negotiated this requirement in paragraph 3(e).

### C. BCW Articulated its Interpretation of and Intentions toward Paragraph 3(e) of the Closing Agreement

The issue to be decided in this remand is whether the extrinsic evidence in this case exhibits that either party knew or should have known whether paragraph 3(e) of the Closing Agreement permitted BCW to use its actual claims paid data to calculate its losses incurred deduction under IRC § 832(c)(4). *See Blue Cross III,* 117 Fed. Appx. at 93. The plaintiff in this case argues that the extrinsic evidence establishes that paragraph 3(e) must be construed to permit BCW to restate its 1987 opening reserve based on actual claims paid data for 1987. BCW argues that they are entitled to use actual claims paid data because: "(a) BCW undoubtedly believed that ¶ 3(e) referred to § 832; (b) the Government had full knowledge of BCW's understanding and, in fact, knew that BCW would not have entered into the agreement if ¶ 3(e) meant something else and; (c) BCW, in contrast, neither knew nor had reason to know that the Government had a contrary understanding (or no understanding)."

The plaintiff argues that there was a meeting of the minds between the two assigned negotiators of the Closing Agreement, Vernon Los of the IRS and Randal Wichinski, BCW's accountant who worked for Ernst & Young. The plaintiff argues that the negotiators agreed that the purpose of paragraph 3(e) was to permit BCW to compute its 1987 losses incurred deduction by restating its 1987 opening reserves. The plaintiff further argues that: "The stage was set by the parties' negotiations over whether BCW was taxable in 1985 and 1986." As explained above, although the 1986 Tax Reform Act did not make Blue Cross plans taxable until 1987, BCW took the position that it had become taxable on January 1, 1985 and, thus, filed corporate income tax returns for 1985

and 1986 and attempted to carry forward the NOL it had incurred in those years.

BCW's aggregate NOL for 1985 and 1986 was $80,013,968.00. Included in this amount was BCW's 1986 estimated losses incurred deduction, which was calculated based upon BCW's 1986 estimated closing unpaid loss reserve. BCW argues, however that this estimated amount was not accurate because of "corrupted data" in a computer system which BCW had used to compute the actuaries for its unpaid loss reserves. Thus, BCW argues that, while the actual amounts paid in 1987 with respect to claims incurred as of January 1, 1987 turned out to be only $42,-267,000.000, the computed reserve estimate (based on BCW's alleged corrupted data) was $78,421,394.00, resulting in an extraordinary redundancy of $36 million. For this reason, and because BCW believed it could claim non-tax exempt tax status beginning in 1985, BCW and the IRS negotiated the amount of NOL that BCW would carry into 1987. It was these negotiations which led to the Closing Agreement at issue in this case.

On September 14, 1992, Mr. Los and Mr. Wichinski had one of multiple meetings and telephone calls in which they attempted to resolve their differences. Initially, the IRS offered that BCW could take 20 percent of their claimed NOL, while BCW insisted on 60–65 percent of their claimed NOL. During the remand hearing in this case, Mr. Wichinski recalled the content of a September 14, 1992 telephone conversation and memorialized the conversation in a contemporaneous memorandum dated September 15, 1992. At the hearing, Mr. Wichinski recalled that Mr. Los offered BCW that plaintiff would be provided with certain benefits of being a Blue Cross organization, including "recalculated unpaid loss reserves based on actual development." Also, the day after the September 14, 1992 discussions, on September 15, 1992, Mr. Wichinski drafted his contemporaneous memorandum, in which he identified the benefits Mr. Los had referred to during the telephone conversation. Among the benefits listed in Mr. Wichinski's 1992 memorandum was that: "Unpaid losses as of December 31, 1986 would be limited to actual development . . . ."

In contrast to Mr. Wichinski's recollection of the contents of the September 14, 1992 telephone conversation with Mr. Los, and Mr. Wichinski's contemporaneous memorandum indicating the government's negotiation regarding BCW's ability to use its actual claims paid data, during the hearing in this case, Mr. Los claimed to have little or no recollection of the contents of the September 14, 1992 conversation. Mr. Los did acknowledge, however, that he had written a contemporaneous memorandum in his case log, in which he had reiterated the fact that he had received a settlement offer from Mr. Wichinski. Mr. Los's memorandum stated:

> Received settlement offer from Randy Wichinski. He wants a 60 percent Government concession. No. I told him that I will concede 50 percent of the Reserve adjustments, the Unrelated Business income Loss Carryforward and 20 percent of the remaining loss. That's it. He will get back to me by Friday, else it goes to a Stat notice.

Mr. Los's strained memory and one paragraph synopsis of the September 14, 1992 negotiation between himself and Mr. Wichinski are far less detailed than Mr. Wichinski's significantly more detailed memorandum, which also was contemporaneous, and the testimony offered by Mr. Wichinski at the remand hearing. In his memorandum recording the same conversation, Mr. Wichinski specifically identified that the parties had discussed that "Unpaid losses as of December 31, 1986 would be limited to actual developments." Although the length of each memorandum does not conclusively prove one interpretation or the other, Mr. Wichinski provided much more detail as to the discussions concerning the concessions the government would provide in exchange for BCW not being a taxable entity for 1985 and 1986. Significantly, one of the concessions, as specifically described by Mr. Wichinski in his memorandum and at the hearing, was that BCW could use its actual claims paid data to recompute its beginning 1987 losses incurred. In contrast, at the hearing, Mr. Los could remember little about the conversation except what he had written in his case memorandum and could not refute either in his testimony or memorandum the information offered on behalf of the plaintiff by Mr. Wichinski.

In an attempt to discount the weight of Mr. Wichinski's testimony and contemporaneous memorandum, in its post-trial brief, the defendant's counsel poses a hypothetical scenario in which she attempts to suggest that the wording or punctuation of the memorandum could have been changed from what Mr. Wichinski had dictated in marking up and transcribing the memorandum. In addition to presenting a thoroughly fanciful argument by suggesting how the paragraph "might have originally read," the defendant's counsel's argument also is thoroughly confusing and unworthy of consideration.

The government further argues that "Appeals Officer Los did not 'Guarantee' that BCW could nullify the requirements of Code § 832 and 846 with respect to BCW's 1987 tax year." Although the defendant does not expand on its "nullify" terminology, as the court found in its earlier opinion, IRC § 832 requires insurance companies to ordinarily compute its losses incurred deduction using the estimated unpaid losses listed on the corporation's annual statement. Specifically, IRC §§ 832(b)(5) and 846 require that, for the purpose of computing the IRC § 832(c)(4) losses incurred deduction, BCW is required to employ the estimate for unpaid losses that appears on BCW's annual statement. As noted, IRC § 832(c)(4) provides a deduction for "losses incurred, as defined in subsection (b)(5) of this section." Section 832(b)(5) of the IRC references IRC § 846, which outlines the discounting formula that should be applied to unpaid losses. Significantly, IRC § 846(b)(1) states that the "undiscounted unpaid losses," to which the discounting formula is applied, "means the unpaid losses shown in the annual statement filed by the taxpayer for the year ending with or within the taxable year of the taxpayer." In other words, for the purpose of computing the IRC § 832(c)(4) deduction, IRC § 832(b)(5), pursuant to IRC § 846, normally requires the use of the unpaid losses outstanding at the end of the preceding taxable year, as shown on the annual statement. In this case, the plaintiff argues that the Closing Agreement permits BCW to use

its 1987 actual claims paid data for the § 832(c)(4) deduction, rather than the amount shown on the annual statement as identified by the IRS statute.

After the conversation between Mr. Los and Mr. Wichinski on September 14, 1992, the plaintiff states that BCW considered Mr. Los's position and provided a counterproposal whereby BCW would receive a $25 million NOL carryforward, in addition to the benefits explained by Mr. Los during the September 14, 1992 telephone conversation. Mr. Los indicated in his case record that he believed that the offer received from BCW on September 17, 1992 was "an acceptable offer" and instructed BCW to draft a Closing Agreement effecting the parties' agreement.

On October 14, 1992, less than one month after the parties had agreed on terms to be drafted into a Closing Agreement, BCW submitted a draft Closing Agreement to Mr. Los. As part of BCW's draft Closing Agreement, paragraph 2(v) of the draft stated that, "the Taxpayer [BCW] ... (v) will redetermine its January 1, 1987 opening loss reserve for incurred-but-not-paid claims using actual claims paid data for 1987 and will adjust such loss reserve as appropriate, pursuant to IRC Section 846 ...." This language reflected the benefits Mr. Wichinski understood that Mr. Los had stated he could "guarantee" during the September 14 and September 17, 1992 telephone conversations. Mr. Wichinski also testified that this paragraph meant to him that BCW "would adjust the unpaid loss reserve that was likely shown on the annual statement for 1986 and use the redetermined loss reserve for calculating our losses-incurred deduction for 1987 ...."

Based upon his testimony regarding the discussions between himself and Mr. Los, Mr. Wichinski's interpretation is reasonable and the court finds BCW's draft language included in the first draft of the Closing Agreement consistent with those discussions and, therefore, strong evidence of BCW's understanding resulting from the negotiations arrived at between Mr. Los and Mr. Wichinski. The language included in the draft Closing Agreement also paralleled the statements testified to by Mr. Wichinski, and which appear in his September 15, 1992 memorandum. In short, the court finds that Mr. Wichinski's inclusion of the actual claims paid data language in BCW's first draft demonstrates BCW's contemporaneous understanding of the agreement reached between the IRS and BCW, as also indicated to the IRS at the time, that BCW should be permitted to recalculate its January 1, 1987 loss reserve using actual claims paid data. The inclusion of this paragraph in BCW's first draft of the Closing Agreement also indicated to the government the importance that BCW placed on being able to recompute its losses incurred using 1987 actual claims paid data.

In response to the draft Closing Agreement prepared and submitted by Mr. Wichinski on October 14, 1992, the government responded with a Closing Agreement on October 22, 1992, that eliminated paragraph 2 and the actual claims paid data language entirely from Mr. Wichinski's draft. The negotiations that followed this exchange of draft Closing Agreements, in which BCW had included the actual claims paid data language, and the IRS had eliminated that language, further identified that both parties understood that the use of actual claims paid data for 1987 was an important issue in reaching an agreement and that the IRS understood BCW's position. Specifically, Mr. Wichinski testified that upon reviewing the IRS's initial draft, which deleted the actual claims paid data language, and discussing the exclusions with Mr. Mordy and Mr. Alberte, BCW determined that the draft as provided by Mr. Los was unacceptable because it excluded the specific language addressing the use of 1987 actual claims paid data for loss reserve computation. Mr. Wichinski further testified that he then spoke with Mr. Los and told him that BCW would not sign an agreement without language specifically addressing loss reserves. In short, BCW explained to Mr. Los that the ability to recompute its loss reserve using actual claims paid data was so important that BCW would not enter a Closing Agreement without it.

During the hearing, Mr. Los stated that he understood that BCW would not sign a Closing Agreement without the inclusion of BCW's ability to recompute its 1987 loss

reserve. Specifically, when questioned, Mr. Los stated:

> Q: [plaintiff's counsel] So he [Mr. Wichinski] pretty clearly told you that this language was so important that there would in fact be no settlement agreement if the Service wouldn't put this language back in there.
>
> A: [Mr. Los] Correct.

As a reason for removing the actual claims paid data language from BCW's draft Closing Agreement, Mr. Los testified that he did not think the language was "relevant." Specifically, Mr. Los stated that his "negotiations with Mr. Wichinski were that we would determine that they were a Blue Cross organization as of January 1, 1987. The rest of it I thought was merely informative .... I didn't really think it was applicable to put in the closing agreement." Mr. Wichinski, however, disagreed, and having determined that the actual claims paid data was integral to any agreement to be made between the IRS and BCW, returned a draft to Mr. Los which placed the actual claims paid data back into the agreement. In this draft, Mr. Wichinski specifically referred to IRC § 846, the provision which, as described above, ordinarily requires insurance companies to use the amount shown on their annual statement to determine unpaid losses. *See* 26 U.S.C. § 846(b)(1). Specifically, Mr. Wichinski's draft stated that "the taxpayer ... will determine its January 1, 1987 opening loss reserve for incurred-but-not-paid claims using actual claims paid data for 1987 and will adjust such loss reserve, as appropriate, pursuant to Section 846, Subtitle A, IRC ...." The inclusion of this terminology exhibits that BCW intended to use its actual claims paid data to affect its section 846 computations, which, in turn would affect its section 832 computations. Hence, BCW plainly communicated to Mr. Los its interpretation and intentions to incorporate the actual claims paid data concept into the Closing Agreement. Based upon the above testimony and exhibits offered, the court finds that Mr. Los had to have understood BCW's position and commitment to having the actual claims paid data included in paragraph 3(e) of the Closing Agreement. Ultimately, the IRS met

BCW's request by signing the final Closing Agreement, which included the "actual claims paid data" language in paragraph 3(e).

The plaintiff also argues that the only conclusion that can be reached as to why BCW agreed to resolve the matter of net operating loss so quickly was because Mr. Los had guaranteed that if BCW accepted a 20 percent NOL in exchange for conceding the tax liability issue, BCW could restate its 1987 opening reserve to actual losses in computing its 1987 losses incurred deduction. The plaintiff argues that this conclusion is "mandated" by Mr. Wichinski's uncontroverted testimony and contemporaneous memorandum as to the discussions of September 14, 1992 and Mr. Los's repeated claims that he could remember nothing of those conversations. The plaintiff further argues that this conclusion is based upon the fact that the guarantee by Mr. Los is the only reasonable explanation for the "abrupt shift in BCW's position in a matter of days." Finally, BCW argues that the requirement by BCW to include the language in the draft agreement and the discussions surrounding the Closing Agreement show that there was a meeting of the minds as to BCW's insistence that it be permitted to use its 1987 actual claims paid data as its 1986 loss reserve.

In addition to BCW's insistence that the language permitting BCW to recompute its loss reserve be included in the Closing Agreement between BCW and the IRS, during the remand hearing in this case, Mr. Los admitted that he knew that losses incurred deduction referred specifically to IRC § 832. When questioned on the matter, Mr. Los testified as follows:

> Q: [plaintiff's counsel] Okay. Is there anything else you can think of that the opening loss reserve for incurred but not paid claims could possibly affect?
>
> A: [Mr. Los] I don't know.
>
> Q: Okay. Now, sir, I just referred to the losses incurred deduction and the Blue Cross special deduction without identifying the statute that they come from.
>
> A: Mm-hmm.
>
> Q: You knew exactly what I was talking about, though, Mr. Los, didn't you?

A: Special deduction I'm not sure.

Q: Okay. But the losses—

A: Is under 832.

From his testimony and the description of Mr. Los's participation in the negotiations preceding the Closing Agreement, it is evident that Mr. Los is an individual who has a sophisticated understanding of tax laws, so much so that he recognized immediately the tax provision which refers to the losses incurred deduction. Indeed, in response to plaintiff's counsel's questioning at the hearing, Mr. Los identified IRC § 832, which is the section the plaintiff claims paragraph 3(e) of the Closing Agreement refers to in the final agreement. Based on the testimony offered at the hearing and reviewing the record, the court has no doubt that Mr. Los understood that the inclusion of paragraph 3(e) of the Closing Agreement referred to IRC § 832(c)(4), and would effect the taxes owed by BCW.

The method by which Mr. Los presented Mr. Gukich, the IRS signing authority, with information regarding the Closing Agreement between BCW and the IRS was in an appeals transmittal and case memorandum. Mr. Los's memorandum was made part of the record during the remand hearing in this case and discussed by Mr. Gukich at the hearing. Although the memorandum is a 48–page document that addresses 32 separate issues that were to be resolved between the plaintiff and the IRS, nowhere in Mr. Los's memorandum does he address the IRS interpretation of paragraph 3(e) of the Closing Agreement. Moreover, Mr. Gukich testified that he had no discussions with Mr. Los regarding either the meaning of the Closing Agreement or any of the issues presented in Mr. Los's memorandum. Specifically, during the hearing, Mr. Gukich testified as follows:

Q: [plaintiff's counsel] So if assuming once again that you've testified that you never saw any of the prior drafts [of the Closing Agreement], so just looking as you testified you did at the final draft which you signed, and looking at the 12–page discussion in this memorandum, that gave you no indication of all the negotiations that had preceded the final version and all of the discussions between Mr. Los and

Mr. Wichinski that may have occurred in respect of how that language finally ended up in the final agreement, correct?

A: [Mr. Gukich] That's correct.

Q: And you had no discussions with Mr. Los about the details of those negotiations?

A: Not that I recall.

Q: Okay. So basically you were presented with a final draft and this lengthy memorandum that had no discussion of paragraph 3(e), and you were asked to sign it based on—on those—those discussion, is that correct?

A: That's correct.

Based upon the evidence discussed above, in particular the fact that the IRS understood that BCW insisted upon the inclusion of a provision in the Closing Agreement permitting BCW to recompute its loss reserve using actual claims paid data, the fact that Mr. Wichinski referred to IRC § 846 in a previous draft of the Closing Agreement, which would effect BCW's section 842 taxes, and the fact that Mr. Los identified IRC § 832 in reference to the losses incurred deduction, the court finds that BCW expressed to the IRS its understanding of paragraph 3(e) of the final Closing Agreement. Moreover, the government understood and did not object to that interpretation when it entered into the agreement. Although the IRS initially had rejected the inclusion of a paragraph that would become paragraph 3(e), ultimately the language permitting BCW to recompute its loss reserve using actual claims paid data was included in the final Closing Agreement signed by the parties. The government provided no evidence at the remand hearing that it took a different view of the meaning of paragraph 3(e). The fact that Mr. Gukich appears to have signed the final Closing Agreement without asking questions prior to signing should not defeat the plaintiff in this case.

**C. The Government Had Reason to Know of BCW's Interpretation**

In this case, the plaintiff argues that although it believes that, prior to signing the Closing Agreement, the government under-

stood BCW's interpretation of the words of paragraph 3(e), even if it did not, the court must conclude that Mr. Los had reason to know of BCW's interpretation of paragraph 3(e). BCW bases this argument upon the fact that Mr. Los was an experienced tax professional. Citing *Perry & Wallis, Inc.,* the plaintiff states that the " 'reason to know' analysis is applied based on the knowledge and skills of the person with whom BCW was dealing." *See Perry & Wallis, Inc. v. United States,* 427 F.2d at 725 ("It is clear that the plaintiff, by reason of its experience in the Seal case, knew or had reason to know the meaning intended by the identical agency of the government in the contract clause involved here. In any event, it was put on inquiry by such experience to investigate such intended meaning."). Indeed, during the hearing, Mr. Los testified as to his experience in tax matters, which included 33 years of service with the IRS. In 1992, when the Closing Agreement between the IRS and BCW was signed, Mr. Los had worked for the IRS for 22 years, having worked his way up from revenue agent to working in the appeals office. Mr. Los's expertise also was recognized by his supervisor, Mr. Gukich, who testified that he relied upon Mr. Los's technical expertise "with respect to technical terms generally on closing agreements . . . ."

The plaintiff argues that because Mr. Los was a "seasoned tax professional," upon whom his superiors relied for complicated tax concepts, Mr. Los had reason to understand the effect of paragraph 3(e) of the settlement agreement. As described above, the plaintiff points out that Mr. Los admitted that he knew from Mr. Wichinski that paragraph 3(e) was an "absolute deal-breaker" and that there would be no settlement without the language permitting BCW to recompute its loss reserve using actual claims paid data. The plaintiff argues that based upon these admissions, it is "inconceivable" for Mr. Los not to have known that paragraph 3(e) was designed to give BCW the right to restate its 1987 opening reserve for purposes of its 1987 losses incurred deduction.

The plaintiff also bases its argument that Mr. Los should have known of BCW's interpretation of paragraph 3(e) upon the evidence that Mr. Wichinski explained to Mr. Los that the language to be used for paragraph 3(e) of the Closing Agreement was derived from the General Explanation of the Tax Reform Act of 1986, or the "Blue Book." *See* Staff of Joint Comm. on Taxation, 99th Cong., General Explanation of the Tax Reform Act of 1986 590 (Comm. Print 1987) (hereinafter "1986 Blue Book"). The plaintiff argues that Mr. Los understood that the language addressing actual and reserved losses derived from the Blue Book. In his testimony, Mr. Wichinski stated that he took the language from the Blue Book because "[t]hat was basically the best authority for that wording and where the transition rule was discussed and explained in more detail and that sort." Mr. Los's hearing testimony also confirms that he knew that the language came from the Blue Book, as follows:

> Q: [plaintiff's counsel] Okay. So your assumption is that you thought the language in there essentially was the Blue Book language?
>
> A:[Mr. Los] Correct.

The government argues, however, that although the language of paragraph 3(e) was taken from the Blue Book, Mr. Alberte, who was BCW's tax manager, testified that no one from BCW ever specifically informed Mr. Los that BCW's reason for putting this language in the Closing Agreement was to affect BCW's IRC § 832(c)(4) taxes. Specifically, Mr. Alberte stated that he "didn't think there was any need to tell Vern Los. Vern Los was an insurance auditor and an insurance appeals officer. Anybody with that type of a back [sic] of background, you know, that kind of knowledge that Vern has would be able to look at that section and understand exactly what it means, especially in light of the fact that he mentions, you know, discounting under 846." Mr. Alberte also stated that the reason BCW did not inform the IRS directly of the reference to paragraph 3(e) to section 832 was because the language permitting BCW to recalculate its loss reserves based on actual claims paid data was "right in the document."

At the outset, the court recognizes that "[a]s a post-enactment explanation, the Blue Book interpretation is entitled to little

weight." *Federal Nat'l Mortgage Ass'n v. United States*, 379 F.3d 1303, 1309 (Fed.Cir.), *reh' and reh'g en banc denied* (2004) (citing *Jones v. United States*, 526 U.S. 227, 238, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)); *see also AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States*, 67 Fed.Cl. 657, 677–78 (2005) ("Subsequent legislative history in the form of Blue Books, summaries of recently passed tax laws prepared by the staff of the Joint Committee on Internal Revenue Taxation, are given similarly restrained readings."). Courts, however, have relied upon the Blue Book to provide explanations to certain tax provisions. *See Federal Power Comm'n v. Memphis Light, Gas & Water Div.*, 411 U.S. 458, 471–72, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973) (stating that the General Explanation of the Tax Reform Act of 1969 (the 1969 Blue Book) "provides a compelling contemporary indication" of the intent of Congress); *Sequa Corp. & Affiliates v. United States*, 437 F.3d 236, 237 (2d Cir.2006) (calling the Blue Book "the most persuasive contemporary secondary source" for interpreting tax provisions); *Images in Motion of El Paso, Inc. v. C.I.R.*, No. 7663–03, 2006 WL 288686 (T.C. Feb. 7 2006) (using the Blue Book to determine the intent of Congress); *Garber Indus. Holding Co., Inc. v. C.I.R.*, 124 T.C. 1, 13, 2005 WL 152023 (2005), *aff'd*, 435 F.3d 555 (5th Cir.2006) (relying on the 1986 Blue Book to interpret tax statutes).

The plaintiff states that, "BCW is not arguing here that the Blue Book independently gave BCW the right to restate its 1987 opening reserve in computing its losses incurred deduction." Instead, the plaintiff states, the "primary relevance of the Blue Book to this case was that it formed a benchmark for Mr. Los and Mr. Wichinski to select wording to implement the concept (guaranteed by Mr. Los) that BCW would be able to restate its 1987 opening reserve in computing its 1987 losses incurred deduction . . . ." During his testimony, Mr. Los, testified that he understood that the language BCW required to remain in the Closing Agreement regarding loss reserves was taken from the Blue Book. Thus, BCW argues that the Blue Book was the source of the language for paragraph 3(e) of the Closing Agreement and that both par-

ties understood the Blue Book as the source and the intended meaning.

The defendant argues that the Blue Book "had no role in the official approval and execution of the Closing Agreement" because the individual who signed the Closing Agreement, Mr. Gukich, was unaware of the Blue Book. The defendant, however, concedes that the "actual claims paid data" language in paragraph 3(e) was based on the passage of the Blue Book found at page 590. Whether or not Mr. Gukich had knowledge of the Blue Book, however, is not central. He did sign the Closing Agreement with the language included in the final version and the record provides no indication that he questioned Mr. Los regarding the meaning of the words of the Closing Agreement.

Although the court recognizes that the Blue Book has little binding weight, as acknowledged by the parties in this case, the Blue Book was relied upon only as the source for language, and not as any authority. The relevant portion of the Blue Book states:

*Accounting Method*

In addition to this special deduction, such organizations are given a fresh start with respect to changes in accounting methods resulting from the change from tax exempt to taxable status. No adjustment is made under section 481 on account of an accounting method change.

Existing Blue Cross/Blue Shield organizations are required to compute their ending 1986 loss reserves without artificial changes that would reduce 1987 income. This rule as to reserve weakening is to be applied so that the incurred-but-not-paid claims reserve at the end of 1986 will be redetermined using actual paid claims data for 1987. That amount will be used for purposes of determining both the surplus at December 31, 1986, and the opening loss reserve at January 1, 1987. Use of actual experience to determine those amounts will eliminate potential controversy over the proper amount of the surpluses and reserves for 1987 tax purposes. The loss reserve then will be adjusted, as appropriate, by the rules of section 1023 of the Act requiring the discounting of unpaid losses.

Staff of Joint Comm. on Taxation, 99th Cong., General Explanation of the Tax Reform Act of 1986 at 590. It was this language from which the parties took the language for paragraph 3(e), however, this language mentions neither IRC § 833 nor IRC § 832.

In the court's previous opinion in this case, the court identified each of the subparagraphs of paragraph 3 and the particular statutory or regulatory reference from which each of the paragraphs was derived. *See Blue Cross I*, 56 Fed. Cl. at 715. Significantly, the court identified that paragraph 3(e) did not refer to any statute or regulation. In addition, the defendant recognizes that paragraph 3(e) is not derived from any particular statute or regulation. The court, therefore determined, based upon the plain reading of the Closing Agreement, that paragraph 3(e) referred only to IRC § 833.

With the benefit of the evidence adduced at the remand hearing, including the testimonial evidence of Mr. Wichinski and Mr. Los, which identifies that the parties agreed that the language of paragraph 3(e) would be modeled on the Blue Book language and not from a particular regulation or statute, the court finds that the parties did not intend for paragraph 3(e) to be limited only to IRC § 833. Instead, the language of paragraph 3(e) represents an independent compromise between the parties and, therefore, is not limited only to IRC § 833. Based upon the testimony at the remand hearing, Mr. Los of the IRS was informed numerous times by BCW that the particular language of paragraph 3(e) was a requirement for BCW to enter the Closing Agreement, and by working closely with Mr. Wichinski, Mr. Los was aware that the language was taken from the Blue Book. Furthermore, when questioned at the remand hearing as to the IRS statute that addressed losses incurred, Mr. Los identified section 832. The court, therefore, is not convinced that the language of paragraph 3(e) was only "comfort information to enable the taxpayer to feel better" as Mr. Los also testified at the hearing. Additionally, the court is not convinced that with his many years of tax experience and his understanding that the language of paragraph 3(e) derived from the Blue Book, Mr. Los could overlook the implication that permitting BCW to use its actual claims paid data would have on the plaintiff's tax computation. As a result of his long experience as an IRS employee, his multiple meetings with BCW, during which BCW strenuously required inclusion of the actual claims paid data language and his negotiations with Mr. Wichinski on the terminology to be used for paragraph 3(e), Mr. Los, and, therefore, the IRS, was informed by BCW of BCW's interpretation and intended meaning of paragraph 3(e). Thus, the IRS understood, or at a minimum had reason to know of BCW's understanding of the meaning of paragraph 3(e) when BCW signed the Closing Agreement.

### D. The Knowledge of the Signing Parties and Imputed Knowledge

Although Mr. Los and Mr. Wichinski were the primary negotiators of the Closing Agreement between the IRS and BCW, neither Mr. Los nor Mr. Laur actually signed the Closing Agreement. The IRS employee who, with authority, signed the Closing Agreement with BCW was Mr. Gukich, the Associate Chief of Appeals of the Wisconsin Tax Division. During the hearing, the court observed that Mr. Gukich had great difficulty remembering facts surrounding the signing of the Closing Agreement. For example, when asked specifically if he remembered what paragraph 3(e) meant when he signed the agreement, Mr. Gukich stated that he "may have discussed it with Mr. Los, but I don't recall."

The plaintiff argues that Mr. Gukich's failed memory "cannot serve to defeat the Closing Agreement." The plaintiff also placed Mr. Gukich's credibility into question by presenting conflicting testimony at the remand hearing with statements made by Mr. Gukich during a deposition previously taken in this case. At the remand hearing, plaintiff's counsel questioned Mr. Gukich on a deposition he had given in 2001. Reading the deposition transcript into the record, Mr. Gukich acknowledged in 2001 that he considered paragraph 3(e) to mean that "the taxpayer must state a loss reserve based upon experience of losses. The effect of it would be the lowered amount of the loss reserve as

of 1–1–87, the more advantageous to the taxpayer." Thus, at least in 2001, Mr. Gukich recognized that paragraph 3(e) permitted BCW to use its actual claims paid in 1987 for its loss reserve. Nevertheless, during the remand hearing in this case, Mr. Gukich could not recall, or would not articulate, what he believed paragraph 3(e) meant at the time he signed the Closing Agreement.

The fact that Mr. Gukich could not recall any aspect of the discussions regarding the Closing Agreement between the IRS and BCW, while perhaps true, is made more suspect by his testimony that Closing Agreements were rare in his duties and that in his tenure as the Assistant Chief of Appeals, he would sign only three or four Closing Agreements a year. When Mr. Gukich did sign a Closing Agreement, he testified that he would rely primarily upon the case memorandum prepared by an Appeals Officer such as Mr. Los to determine appropriate action, but generally would not discuss the case with the Appeals Officer. Thus, Mr. Gukich testified that he relied upon the Appeals Officer, in this case Mr. Los, with respect to the drafting and understanding of the Closing Agreement. Specifically, Mr. Gukich testified:

Q: [defendant's counsel] Okay. At the time you served as the associate chief of appeals office in 1992 and '93, you didn't consider it your job to try to understand every detail of every closing agreement that was brought to you for signature, did you?

A: [Mr. Gukich] That's correct. I relied on the—the expertise of the appeals officer who was working the appeal.

The defendant attempts to use Mr. Gukich's failure to discuss the Closing Agreement with Mr. Los to argue that "at the time he signed the Closing Agreement, Associate Chief Gukich did not share BCW's interpretation of subparagraph 3(e)." Specifically, the defendant argues that Mr. Gukich's inability to remember much detail about the circumstances surrounding his signing the Closing Agreement is "indicative of the lack of significance he and Appeals Officer Los gave to subparagraphs (a)—(f) of ¶ 3, and indeed to the settlement as a whole," despite his testimony that he did not question Mr. Los about the final version of the Closing Agreement.

Recognizing that at the hearing Mr. Gukich did not find himself able to recall whether he had a specific interpretation of paragraph 3(e), and if so, what it was, when he signed the agreement, and that he testified he relied heavily upon the advice of his Appeals Officer, Mr. Los, who negotiated with BCW, the plaintiff argues that this lack of memory does not negate any meeting of the minds as between the IRS and BCW. Instead, the plaintiff argues that Mr. Los had a duty to inform Mr. Gukich of all relevant aspects of the Closing Agreement and that the knowledge of the Appeals Officer, Mr. Los, should be considered knowledge of the principal or signing agent, Mr. Gukich, when such reliance was placed on Mr. Los by the signing official. In short, the plaintiff argues that the information and understanding held by Mr. Los concerning BCW's interpretation of paragraph 3(e) should be imputed to Mr. Gukich.

In the context of a tax case, the United States Court of Federal Claims has found that the knowledge of an IRS employee may be imputed to the IRS employee's supervisor. *See Mobil Corp. v. United States,* 67 Fed.Cl. 708, 725 n. 34 (2005) ("Thus, if Ms. Soderberg [an IRS Senior Team Coordinator for Mobil], who is the primary point of contact between the parties, had the requisite knowledge, we think that her knowledge (actual or constructive) could be imputed to Mr. Guastello [the IRS Case Manager/Team Manager who was assigned to Mobil's account]."). Additionally, in cases outside of the realm of the IRS, the United States Court of Appeals for the Federal Circuit has held that an individual with appropriate contracting authority may have knowledge imputed to him or her. *See Giesler v. United States,* 232 F.3d 864, 869 (Fed.Cir.2000) (finding that contracting officers may have "actual or imputed" knowledge (quoting *Ruggiero v. United States,* 190 Ct.Cl. 327, 420 F.2d 709, 713 (1970))); *Bromley Contracting Co., Inc. v. United States,* 794 F.2d 669, 672 n. 15 (Fed.Cir.1986) ("Our decision on the contracting officer's actual or imputed knowledge is dispositive of this case.").

In this case, like in *Mobil,* Mr. Los was the primary point of contact between the IRS and BCW for the negotiations pertaining to the Closing Agreement. It is appropriate, therefore, to consider that any knowledge obtained by Mr. Los regarding BCW's interpretation of the final Closing Agreement may be imputed to Mr. Gukich by Mr. Los, who was involved in the preparation of the final agreement, agreed to its terms prior to submitting it for approval and offered a briefing to Mr. Gukich, the approving official, on all relevant facts pertaining to the document prior to Mr. Gukich affixing his signature. Furthermore, knowledge by the IRS of BCW's interpretation should not be rendered of no effect because Mr. Gukich failed at the hearing to recall how he interpreted the Closing Agreement, especially when he indicated clearly that he signed after relying on the recommendation of his staff, in this case, Mr. Los and his earlier deposition suggests that he understood BCW's interpretation.

The defendant argues that "private agency principles do not apply to the federal government" and that the government cannot be bound to BCW's interpretation of paragraph 3(e) by estoppel. Relying on principles of contracting authority, the defendant argues that Mr. Los did not have the authority to bind the IRS, even if he did "guarantee" certain benefits to BCW. Contrary to the government's argument, this case is not one involving an issue of government authority. Nor does this case involve any estoppel arguments. The signing official had authority to sign the Closing Agreement. Additionally, the defendant incorrectly describes the plaintiff's argument when it states that "BCW then argues that Mr. Los's alleged 'guarantee' should be imputed to Associate Chief Gukich, through private agency principles." BCW does not argue that Mr. Los had the authority to sign the Closing Agreement. Moreover, BCW has never raised an estoppel argument based upon any guarantees made by Mr. Los. What the plaintiff argues is that Mr. Wichinski's September 15, 1992 memorandum, and BCW's persistence on inclusion of paragraph 3(e) in the agreement are to be combined with Mr. Los's statements to the effect that certain settlement terms would be included in the final Closing Agreement.

Furthermore, BCW argues that what should be imputed to Mr. Gukich is the knowledge understood by Mr. Los that the parties understood that paragraph 3(e) would affect BCW's IRC § 832(c)(4) deduction.

This court agrees with the plaintiff and holds that Mr. Los's understanding of the interpretations that BCW had of paragraph 3(e) may be imputed to Mr. Gukich, regardless of the fact that Mr. Gukich may not have spoken to Mr. Los specifically about paragraph 3(e). Although at the remand hearing, Mr. Gukich's memory failed him entirely, his deposition testimony suggests that Mr. Gukich may well have understood the BCW meaning of paragraph 3(e). Mr. Los was the appeals officer assigned to BCW, and his direct supervisor was the agency official who signed the Closing Agreement between the IRS and BCW. As Mr. Los's supervisor for the IRS, Mr. Gukich is imputed with the knowledge, either constructive or actual, held by Mr. Los. As the plaintiff correctly identifies, the opposite holding would have "exceedingly adverse consequences ... a taxpayer could never rely on any closing agreement, since there would always be the risk that the Service could later claim that something the appeals officer fully understood and agreed to was not properly communicated to the supervisor who physically signed it." Certainly, the IRS cannot intend that an IRS senior employee authorized to sign closing agreements, such as the one in this case, must either participate in the negotiations leading up to an agreement, or assure a taxpayer that he or she understands every word of the agreement, before a taxpayer can rely on the IRS signature affixed to such an agreement.

In this case, BCW clearly communicated to Mr. Los its insistence on including the language permitting BCW to recalculate its closing 1986 loss reserve using actual claims paid data for 1987 in the final Closing Agreement. Neither Mr. Los's recollection that he communicated this information specifically to Mr. Gukich, nor Mr. Gukich's failure to inquire specifically about paragraph 3(e) or remember anything about the agreement, should negate the fact that BCW, through Mr. Wichinski, explained the plaintiff's inter-

pretation of the meaning of paragraph 3(e). Based on the evidence produced by the plaintiff at the remand hearing, this court finds that the defendant knew or, at the very least should have known, the meaning placed on paragraph 3(e) of the Closing Agreement. Upon consideration of the evidence set forth during the remand hearing in this case, this court finds that the plaintiff expressed to the IRS BCW's insistence on including as part of the Closing Agreement paragraph 3(e), which it understood permitted BCW to restate its loss reserve using actual claims paid data. Most tellingly, in the extensive negotiations that occurred between BCW and the IRS, BCW made it abundantly clear that it would not agree to a Closing Agreement that did not permit BCW to recalculate its loss reserve using its actual claims paid data.

As noted above, originally, this court found the Closing Agreement to be unambiguous and clear on its face and, on a reading of the agreement, the defendant prevailed. On appeal, the Federal Circuit found ambiguity in the Closing Agreement, which opened the door for extrinsic evidence. Based on this court's subsequent review of the extrinsic evidence, plaintiff prevails. These differing results are not necessarily at odds with each other and irreconcilable. For, if a document is clear on its face, a contrary understanding by a party, even one at odds with the facial agreement, may not be considered. The parties effectively sign up to the clear language in their agreement. In such a case, the document itself reflects the agreement of the parties, and will not to be subverted by extraneous matters, including unilateral "understandings." Only if there is ambiguity in the document, as the Federal Circuit found in this case, will the court be permitted to reach for extrinsic evidence, which need not, but may well change the reading of a document, as it did here.

### CONCLUSION

After reviewing the extrinsic evidence produced during the remand hearing in this case, the court finds that the plaintiff plainly communicated to the IRS, BCW's interpretation of and intentions with regard to the effect of paragraph 3(e), and that the IRS

agreed to that interpretation by including the language in the final, signed Closing Agreement. The result is that BCW should be entitled to readjust its January 1, 1987 loss reserve using actual claims paid data for 1987 and is permitted to use that adjusted amount to calculate its IRC § 832(c)(4) taxes. The plaintiff's motion for partial summary judgment is, therefore, **GRANTED** and the defendant's motion for partial summary judgment is **DENIED**. The parties shall file a joint status report within ten days of the issuance of this opinion setting forth a method for final resolution of the case.

**IT IS SO ORDERED.**